[Crim. No. 7891. Third Dist. Dec. 15, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHNNY RAY EARNEST, Defendant and Appellant.

COUNSEL

Richard Keith Corbin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Eddie T. Keller and Gary A. Binkerd, Deputy Attorneys General, for Plaintiff and Appellant.

OPINION

PARAS, J.—A jury convicted defendant of arson (Pen. Code, § 447a);[1] sentence was suspended and he was placed on probation. He appeals.

Defendant solicited a 15-year-old boy, Ruben Munoz, to burn down his house so that he could collect the insurance proceeds. Munoz died in the fire, and defendant was originally indicted for murder as well as arson. The trial court dismissed the murder count (§ 995) and this court affirmed in *People* v. *Earnest* (1975) 46 Cal.App.3d 792 [120 Cal.Rptr. 485].

The fire occurred on Saturday, July 7, 1973, at approximately 9:30 p.m. There is no question that the fire was set by Ruben. On January 25, 1974, Sergeant Robert Jones of the Woodland Police Department questioned defendant's stepfather, Paul May, in the Commanche County Jail in Lawton, Oklahoma. May told Jones that approximately a week before the fire, while riding in a car occupied by defendant and Ruben, he overheard a conversation between them about the burning of defendant's house. Defendant told Ruben that he wanted to get some money to buy into a small business or to buy two homes, live in one, and rent the other. He asked Ruben how much money he wanted to set the house on fire. Ruben stated that they were friends and that he would take nothing for it, but defendant insisted that since he would thereby make money, Ruben should also make money. The fire was to occur approximately two to three months later, after defendant checked to make sure the fire insurance policy premium was paid. It was finally decided that Ruben would receive $100 for the burning.

Before the grand jury and at defendant's trial, May admitted making these statements to Sergeant Jones, but stated that except for riding in the car with Ruben and defendant, they were all lies he manufactured

[1]All section references are to the Penal Code, unless otherwise indicated.

because he was angry with defendant. He was angry because he had just been convicted of second-degree murder in Oklahoma and defendant's brother had "turned state's evidence" against him in the case; he felt that defendant "could have cleared" him if he had come to Oklahoma and testified. He added that Sergeant Jones offered to give him some information to help get a reversal of his conviction, in return for his cooperation.

Linda Martinez, a former neighbor and friend of Ruben, testified to five conversations she had with Ruben prior to his death. Approximately three weeks prior to the fire, Ruben told her of his intention to set fire to defendant's residence. About a week later, Ruben and Linda engaged in a second conversation in which Ruben reiterated his intention to burn the residence, and also told her he would set the fire at 9:30 p.m. on a Saturday within the next two weeks, no one would be at home when he arrived; he would find a gasoline can on the back porch; the back door would be kicked in to suggest that the house had been broken into; all of the windows would be shut; and the gas would be left on inside the house. He told Linda he was to pour gasoline along the outside of the house and ignite it with a fuse constructed of a lit cigarette and a book of matches devised so as to provide him time to get away. Linda was also told that Ruben was to receive $100 for his efforts.

A third conversation occurred between Ruben and Linda approximately one week prior to the fire, during which Ruben stated that he would have some money by the following Monday for burning the house.

On the day of the fire, Ruben and Linda conversed on two occasions. In the first conversation she asked him if he still planned to set the fire. Receiving an affirmative response, she told him that if he did not change his mind she would have to tell either the police or his mother. He indicated that he would think about it. The second conversation was by telephone at approximately 8:30 p.m. Ruben related that having thought the matter over, he had changed his mind and wouldn't go through with it.

Steven Fernandez testified that he was Ruben's cousin and that Ruben had lived with him and his wife Lisa prior to the fire. Sometime during the evening of the fire, Ruben asked Steven in the presence of Lisa, if Steven could give him a ride later in the evening. Later, Steven asked Ruben if he wanted to go, and Ruben responded that he wanted to wait until it was a little darker. Still later, Ruben said that he was ready to

leave, and Ruben and Steven departed. Ruben was not carrying anything.

After parking on Locust Street, within walking distance of defendant's Elm Street residence, Ruben declared, "I am going to burn this guy's house down." When Steven asked him why, Ruben responded, "Johnny's going to pay me for it." He also stated that Johnny wanted to collect on the fire insurance and that Ruben was to get $90 or $100 for his participation. Steven asked Ruben if he knew what he was doing, to which Ruben replied, "Johnny's got it all worked out." Ruben then outlined some of the details of the plan. He indicated that the back door was to be open with the appearance of having been forced, and a gasoline can and papers were to be available. He was to set the fire with a lit cigarette and a match book fuse. As Ruben left Steven he said, "Be right back."

Five to seven minutes later, from his parked car, Steven saw the glow of the flames from the burning building. Mrs. Adelia Cook, next door neighbor to defendant, heard an explosion and observed flames erupt from the residence. She immediately telephoned the fire department. The firefighters, in addition to finding the boy's charred body, discovered a partially filled gasoline can in the house. There was also evidence that the back door had been forcibly opened. The physical evidence at the scene suggested that the boy had spread an inflammable liquid in two areas of the house; the liquid was ignited by one of two probable flame sources, the floor furnace or a pilot light on the water heater.

Because defendant and his wife could not obtain credit, the house was nominally owned by Mrs. Florence McDermott, grandmother of defendant's wife; but all of the payments on an outstanding loan and encumbrance against the property were paid by defendant. A fire insurance policy was also taken out in Florence McDermott's name, but all premiums were paid by defendant. After the house burned, all insurance proceeds in excess of the amount of the outstanding loan were paid to Mrs. McDermott, who in turn paid them to defendant and his wife.

Defendant testified in his own behalf, and denied any involvement. He makes five contentions on appeal:

1. All the evidence connecting defendant with the crime was inadmissible hearsay.

2. There was no substantial evidence of his guilt.

3. The trial court erred in failing to instruct *sua sponte* on the definition of conspiracy.

4. The trial court erred in denying defendant's motion for dismissal of the arson count on the ground that he was charged with the wrong crime.

5. Juror number 12 should have been dismissed for cause on the ground of actual bias.

I

■ Defendant's first and second contentions are properly treated together, as the basis for the argument that the evidence was not substantial is that it was entirely hearsay. The contentions are rejected.

Defendant cites no authority for his proposition that properly admissible hearsay is per se insubstantial. None can be found. In *People v. Petersen* (1972) 23 Cal.App.3d 883 [100 Cal.Rptr. 590], the court upheld defendant's conviction, even though the only evidence associating him with possession of the dynamite used in the crime consisted of his prior admission thereof. Indeed, the principal reason for all the exceptions to the hearsay rule is that under certain circumstances hearsay statements are as reliable as statements made in court. This is certainly true of the four exceptions here in issue: May's prior inconsistent statements (Evid. Code, § 1235); defendant's admissions (Evid. Code, § 1220); Ruben's declarations offered to show his state of mind (Evid. Code, § 1250), and statements of a coconspirator (Evid. Code, § 1223).

Defendant challenges the admissibility of all of Ruben's declarations on the ground that they were admissible only as declarations of a coconspirator, and the conspiracy was not sufficiently established by prior independent proof from some source other than the declarations of the conspirator himself. (*People v. Morales* (1968) 263 Cal.App.2d 368 [69 Cal.Rptr. 402]; *People v. Murphy* (1943) 60 Cal.App.2d 762 [141 P.2d 755].)

■ The foundational requirement may be met without establishing a conspiracy beyond a reasonable doubt or even by a preponderance of the evidence; only prima facie evidence of the fact is required. (*People v. Steccone* (1950) 36 Cal.2d 234, 238 [223 P.2d 17].) ■ The declara-

tion of Paul May as to the conversation he overheard between defendant and Munoz is sufficient independent proof of the conspiracy. Defendant contends that since May stated he lied in making the statement, it was unworthy of belief, and thus insufficient to establish prima facie evidence of the conspiracy. We disagree. The fact that a witness repudiates an earlier statement makes one or the other statement unworthy of belief, but the jury determines which one. Since May's statements adequately supplied the foundation, any of Ruben's statements made during and in furtherance of the conspiracy were admissible. (*People* v. *Saling* (1972) 7 Cal.3d 844, 852 [103 Cal.Rptr. 698, 500 P.2d 610].) Ruben's statement to Linda Martinez on the day of the fire, that he had decided not to go through with his plans to burn down defendant's house, were obviously intended to forestall her threats to reveal the plans. This was consistent with and in furtherance of the conspiracy, and thus admissible. Likewise Ruben's statements to Steven Fernandez were to secure transportation and to solicit Steven's assistance in providing a getaway vehicle for Ruben's escape from the scene. However ill-advised these statements may have been, they succeeded in their objective (Steven waited, and did not interfere) and were also made during and in furtherance of the conspiracy.

Ruben's other statements to Linda were not admitted under the coconspirator exception, but under the state of mind exception to the hearsay rule. Section 1250 of the Evidence Code states, in part:

"(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when:

"(1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or

"(2) The evidence is offered to prove or explain acts or conduct of the declarant."

The Attorney General concedes that Ruben's state of mind was not itself an issue in the action, thus eliminating subdivision (1) as the basis of admissibility. But the statements, being expressions of Ruben's "intent, plan, motive, [and] design" were "offered to prove or explain acts or conduct of the declarant" in conformity with that state of mind.

The conversations revealed Ruben's intent to burn the Elm Street residence, monetary reward as the motive, and details of the time and manner of the act as per the plan and design. Evidence at trial indicated that Ruben acted in conformity with this state of mind, i.e., the fire was set on a Saturday two weeks later at approximately 9:30 p.m., the occupants were not home at the time, the house appeared as if it had been broken into, the gas was on, and a gasoline can was on the premises. (See *People* v. *Brust* (1957) 47 Cal.2d 776 [306 P.2d 480]; *People* v. *Alcalde* (1944) 24 Cal.2d 177 [148 P.2d 627].)

■ In addition to these challenges to the admission of hearsay evidence, defendant contends that the admission of Ruben's hearsay statements deprived him of his Sixth Amendment right to confront the witnesses against him, citing *California* v. *Green* (1970) 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930] and *Dutton* v. *Evans* (1970) 400 U.S. 74 [27 L.Ed.2d 213, 91 S.Ct. 210].

In *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], it was held that the admission at a joint trial of the extrajudicial confession of a nontestifying defendant implicating a codefendant violates the codefendant's right to cross-examination secured by the confrontation clause of the Sixth Amendment, despite instructions limiting the admissibility of the statement to the declarant. However, in a footnote, the United States Supreme Court specifically noted that there was not before it "any recognized exception to the hearsay rule insofar as petitioner is concerned and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause." An opportunity to clarify the import of this footnote in relation to the coconspirator's exception to the hearsay rule was presented to the court in *Dutton* v. *Evans, supra.* There the court held that the admission of a coconspirator's declarations under a Georgia rule more expansive than the federal rule, though not made in the presence of the person against whom they were offered in evidence, did not violate the confrontation clause or the *Bruton* rule. See *United States* v. *Clayton* (1st Cir. 1971) 450 F.2d 16, 20, cert. den., 405 U.S. 975 [31 L.Ed.2d 250, 92 S.Ct. 1200]; *United States* v. *Cox* (10th Cir. 1971) 449 F.2d 679, 688-689, cert. den (1972) 406 U.S. 934 [32 L.Ed.2d 136, 92 S.Ct. 1783]; *United States* v. *Weber* (3d Cir. 1970) 437 F.2d 327, 339-340, cert. den. (1971) 402 U.S. 932 [28 L.Ed.2d 867, 91 S.Ct. 1524]. And in *People* v. *Brawley* (1969) 1 Cal.3d 277, 291 [82 Cal.Rptr. 161, 461 P.2d 361], cert. den. sub. nom. *Baker* v. *California* (1971) 400 U.S. 993 [27 L.Ed.2d 441, 91 S.Ct. 462], the California Supreme Court held that our statutory

scheme contained sufficient safeguards that the receipt of statements under the California statutory exception does not violate the right of confrontation of an accused coconspirator.

Under the *Dutton* and *Brawley* decisions, defendant was not deprived of his Sixth Amendment rights. Defendant's attempt to distinguish those cases on the ground that here the evidence was "crucial" to the prosecution and "devastating" to the defense, (see *Dutton, supra,* 400 U.S. at p. 87 [27 L.Ed.2d at p. 226]) is not persuasive, in light of the *Brawley* court's observation that "the California procedure contains more safeguards for a defendant than the . . . federal procedure, and if the federal procedure does not violate the confrontation clause of the Sixth Amendment a fortiori neither does the California procedure." (*Brawley, supra,* 1 Cal.3d at p. 291.) Moreover, in every criminal conviction, there necessarily exists some evidence which is crucial to the prosecution and devastating to the defense. That circumstance makes it neither objectionable nor suspect.

## II

■ Defendant's third contention is that the trial court erred in failing to instruct *sua sponte* on the definition of conspiracy. The jury was instructed in accordance with section 1223 of the Evidence Code that it could consider the hearsay statements of Ruben only if it first found by independent evidence that a conspiracy existed between Ruben and defendant. The trial court did not give, and defense counsel did not request, an instruction defining conspiracy. Defendant's assertion of error rests upon the principle that the court must instruct on the general principles of law relevant to the case, even in the absence of a request by counsel. (Pen. Code, §§ 1093, subd. 6, 1127; *People* v. *Hood* (1969) 1 Cal.3d 444; 449 [82 Cal.Rptr. 618, 462 P.2d 370]; *People* v. *Graham* (1969) 71 Cal.2d 303, 318 [78 Cal.Rptr. 217, 455 P.2d 153]; *People* v. *Iverson* (1972) 26 Cal.App.3d 598, 604 [102 Cal.Rptr. 913].)

■ Where, as here, the contention is that the instructions given needed amplication or explanation, the rule is that, in the absence of a request therefor, error cannot be predicated on the trial court's failure to instruct further on its own motion (*People* v. *Anderson* (1966) 64 Cal.2d 633, 639 [51 Cal.Rptr. 238, 414 P.2d 366]) except where the terms used have a technical meaning peculiar to the law. (*People* v. *Hood, supra; People* v. *Burns* (1948) 88 Cal.App.2d 867, 873 [200 P.2d 134].)

■ The word "conspiracy" as used in section 1223 of the Evidence Code has the same meaning as in section 182 of the Penal Code. It is an agreement between two or more persons (with specific intent) to achieve an unlawful objective, coupled with an overt act by one of the conspirators in furtherance thereof. (*People* v. *Morales, supra,* 263 Cal.App.2d at p. 375, and cases cited.) There can be no question that this definition contains elements not generally understood by the lay public. For instance, Webster's Third New International Dictionary (1971) defines "conspiracy" as ". . . an agreement manifesting itself in words or deeds and made by two or more persons confederating to do an unlawful act . . . ." This definition omits the legal requirement of an overt act. "Conspiracy" as used in section 1223 of the Evidence Code (and CALJIC No. 6.24) has a technical legal meaning which requires the court to define it *sua sponte.* The court's failure to do so in the present case was error.

The error is not however reversible. The layman's understanding of the term "conspiracy" includes at the very least the concept of an agreement with intent to secure an unlawful end, so we presume that the jury found this much. The overt act need not be committed by the defendant; it is sufficient to establish the conspiracy if *any* conspirator commits it. (Pen. Code, § 184.) In convicting the defendant, the jury necessarily found that Ruben committed the act of burning defendant's house, which overt act was done during and in furtherance of the conspiracy. Thus, it is apparent that the jury necessarily found all the facts necessary to establish a conspiracy, even under a proper instruction. Accordingly, there is no possibility that a proper instruction would have changed the result, and the error is not prejudicial. (*People* v. *Gordon* (1973) 10 Cal.3d 460, 470 [110 Cal.Rptr. 906, 516 P.2d 298].)

### III

■ Defendant contends that he was charged with the wrong crime. He was charged and convicted under section 447a, which reads: "Any person who wilfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels or procures the burning of any trailer coach, as defined in Section 635 of the Vehicle Code, or any dwelling house, or any kitchen, shop, barn, stable or other outhouse that is parcel thereof, or belonging to or adjoining thereto, whether the property of himself or of another, shall be guilty of arson, and upon conviction thereof, be sentenced to the penitentiary for not less than two or more than 20 years."

Section 548 provides: "Every person who wilfully burns or in any other manner injures, destroys, secretes, abandons or disposes of any property which at the time is insured against loss or damage by fire, theft, or embezzlement, or any casualty with intent to defraud or prejudice the insurer, whether the same be the property or in the possession of such person or any other person, is punishable by imprisonment in the state prison for not less than one year and not more than ten years."

At the conclusion of the case, before the matter was submitted to the jury, defendant's trial counsel moved for dismissal, contending that the prosecution, having presented extensive evidence that defendant's motive was to defraud the insurance company, was obligated to prosecute under sections 450a[2] and 548. The motion was denied.

█ It is a firmly established principle that where specific conduct is prohibited by a special statute, a defendant cannot be prosecuted under a general statute. (*People* v. *Ali* (1967) 66 Cal.2d 277, 279 [57 Cal.Rptr. 348, 424 P.2d 932]; *In re Greenfield* (1970) 11 Cal.App.3d 536 [89 Cal.Rptr. 847]; *People* v. *Churchill* (1967) 255 Cal.App.2d 448, 452 [63 Cal.Rptr. 312] (special § 484a relating to credit card offenses precludes prosecution under general statutes); *People* v. *Fiene* (1964) 226 Cal.App.2d 305, 308 [37 Cal.Rptr. 925] (special statute making it a crime to defraud an innkeeper supersedes and bars prosecution for petty theft); *People* v. *Haydon* (1951) 106 Cal.App.2d 105 [234 P.2d 720] (general § 72, making false claims a felony, held repealed *pro tanto* by special Unemp. Ins. Code section making false statements a misdemeanor); *In re Williamson* (1954) 43 Cal.2d 651 [276 P.2d 593] (general § 182, conspiracy statute held inapplicable in light of Bus. & Prof. Code, § 7030 making it a misdemeanor to conspire to act as a contractor without a license); *People* v. *Silk* (1955) 138 Cal.App.2d Supp. 899, 900 [291 P.2d 1013] (Welf. & Inst. Code, § 2007 prohibiting fraudulently obtaining Old Age Pension aid, held controlling over § 484, on false pretenses); *People* v. *Wood* (1958) 161 Cal.App.2d 24 [325 P.2d 1014] (former Veh. Code, § 131, subd. (d), misdemeanor to make false statement to Department of Motor Vehicles supersedes § 115, making it a felony to file a false instrument).)

█ Where a general statute, standing alone, would include the same matter as a special act and thus conflict with it, the special act will be

---

[2]Section 450a makes it a crime, wilfully and with intent to injure, to burn "goods, wares, merchandise or other chattels or personal property of any kind" which is insured. The arson count charged and the proof showed that the defendant procured the burning of "the dwelling house located at 68 Elm Street, Woodland, California," which is of course outside the purview of section 450a.

considered as an exception to the general statute. (*In re Williamson, supra,* 43 Cal.2d at p. 654; *People* v. *Gilbert* (1969) 1 Cal.3d 475, 479 [82 Cal.Rptr. 724, 462 P.2d 580].)

█ It is immediately apparent that analysis of sections 447a and 548 in the light of the foregoing principle yields an internally contradictory result. Comparing the respective intents constituting elements of the crimes thereby defined, we note that the general intent required to commit a violation of section 447a (*People* v. *Nance* (1972) 25 Cal.App.3d 925, 928 [102 Cal.Rptr. 266]) is broader than and includes the specific intent which is a component of the crime defined by section 548. Next, considering only the acts characterizing the respective crimes, we note that the conduct condemned by section 548 is broader than and inclusive of the narrower range of conduct constituting a violation of section 447a. Thus, although in a general sense each statute involves the same subject matter, section 447a is the more particular in terms of the acts characterizing the respective offenses, while section 548 is the more particular when the comparison focuses solely upon the respective intents required.

A more detailed examination of the two Penal Code provisions does not resolve the contradiction to which we have adverted but does, in our view, tend to support our conclusion that section 447a is in fact the more specific of the two. Section 447a not only makes it a crime to set fire to or burn a dwelling or outbuilding, but also to cause the same to be burned or to aid, counsel or procure the burning thereof. In significant contrast section 548 does not literally proscribe any activity other than the direct commission of an act constituting the offense. If defendant, who did not himself set the fire, had been prosecuted under section 548, he would doubtless have defended on the basis that his conduct was not prohibited by that section, but instead by section 447a, by force of the special provisions of the latter dealing with active participants not themselves the direct perpetrators of the criminal act. It may, of course, be argued that the application to section 548 of the provisions of section 31 (defining parties to a criminal act) resolves this seeming disparity and therefore that section 447a is not more specific merely by reason of the inclusion therein of an express definition of parties to which it applies. The provisions of section 31, however, are not coextensive with those of section 447a.[3] Section 31 does not specifically embrace causing or

---

[3]Section 31 provides in part: "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or not being present, have advised and encouraged its commission . . . are principals in any crime so committed."

procuring the commission of a crime. Section 447a expressly prohibits such conduct in relation to an act of arson, which is precisely the conduct of this defendant. Thus, the language in section 447a, specifying parties whose conduct falls within the prohibition of that section, is more specific than the language of section 31 which defines those who are parties to a violation of section 548.

Consequently, as between sections 447a and 548 we are unable definitively to denominate either as the more specific so as to supplant the other. Therefore, under the rule above stated, section 548 is not an exception to section 447a so as to preclude prosecution under the latter when the act prohibited by it coincidentally is accompanied by the specific intent "to defraud or prejudice [an] insurer."

We consider this result consonant with the manifest legislative intent to provide more stringent punishment for the narrow category of crimes against property which involves the deliberate attempted or actual burning of buildings likely to be inhabited, because of the obvious danger to human life attendant thereon. Nor can we impute to the Legislature solely from the existence of a statute in material respects more general than section 447a and its antecedents (see §§ 447-455 enacted 1872, repealed Stats. 1929, ch. 25, § 6, p. 47), the intent to remove from the ambit of the latter section a considerable number of offenses for which stronger condemnation has been historically reserved precisely because of the danger to human life and safety associated therewith (see Stats. 1856, ch. 110, p. 132; §§ 447-455 enacted 1872, repealed Stats. 1929, ch. 25, § 6, p. 47).

The defendant was properly charged and tried under section 447a of the Penal Code.

## IV

■ Defendant's final contention is that the trial court erred in denying defendant's motion to dismiss juror number 12, Joseph Levario, for cause, after defendant had exhausted all of his peremptory challenges. On *voir dire*, Mr. Levario stated that he knew Tillie Fernandez, Ruben Munoz's aunt, and saw her about twice a year. Although he had never spoken to Ruben, he said he would know him if he saw him on the street. Levario also knew that Steven Fernandez was Ruben's cousin, but was unable to say for sure whether he knew Steven.

Defendant's counsel asked Levario, "and as I understand it, you are saying that even though you know [his relatives], that wouldn't affect your decision in any way?" Levario responded, "Well, I don't think so." Later the colloquy continued:

"[MR. ACKLEY, defense counsel]: And if you had, for example, to choose between the testimony of Tillie Munoz [*sic*] or any of these people that you know; and, say, Mr. Earnest, would you tend to believe the testimony of the Munozes because you know them?

"A. No, I wouldn't.

"Q. You could set that aside—

"A. Yes.

"Q. —and say, even though I know them, I still believe Mr. Earnest, I believe somebody else; is that your state of mind?

"A. Yes."

In addition, Levario stated he had read about the case in the newspaper, and was questioned as follows:

"THE COURT: Now, what have you read in the paper, have you come to any conclusions at this time?

"MR. LEVARIO: No, I don't.

"THE COURT: All right. You have an open mind about this thing at this point, is that correct?

"MR. LEVARIO: Yes."

Section 1073 provides that a challenge for cause based on actual bias will lie for "the existence of a state of mind on the part of the juror in reference to the case, or to either of the parties, which will prevent him from acting with entire impartiality and without prejudice to the substantial rights of either party . . . ."

The question of whether a prosepective juror has a prejudiced state of mind amounting to actual bias is ordinarily an issue of fact left to

the sound discretion of the trial judge. (*People* v. *Eudy* (1938) 12 Cal.2d 41, 45 [82 P.2d 359].) When a juror admits he is actually prejudiced he is not a proper juror. (*Lombardi* v. *California St. Ry. Co.* (1899) 124 Cal. 311, 313-317 [57 P. 66].) But when the juror consistently affirms his willingness and ability to act impartially in weighing the evidence and applying the law upon which he will be instructed, there must be facts which clearly show the juror's bias to warrant a reversal of the trial judge's decision. (*West Coast Securities Co.* v. *Kilbourn* (1930) 110 Cal.App. 293, 296-297 [294 P. 57].) It is also the rule that "Where a prospective juror gives conflicting answers to questions relevant to his impartiality, the trial court's determination as to his state of mind is binding upon an appellate court. [Citations omitted.]" (*People* v. *Linden* (1959) 52 Cal.2d 1, 22 [338 P.2d 397]; *People* v. *Carter* (1961) 56 Cal.2d 549, 574 [15 Cal.Rptr. 645, 364 P.2d 477].)

 In the present case, juror Levario did not demonstrate a prejudicial "state of mind" within the meaning of section 1073. Based upon the record before us, we cannot say that the mere acquaintance of juror Levario with Ruben and the Fernandezes is sufficient to render the trial court's denial of a challenge for cause an abuse of discretion.

The judgment is affirmed.

Puglia, P. J., and Janes, J., concurred.

A petition for rehearing was denied January 5, 1976, and appellant's petition for a hearing by the Supreme Court was denied February 11, 1976.