[No. B052866. Second Dist., Div. Seven. July 8, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
CARLOS FLORES, Defendant and Appellant.

## Counsel

David D. Carico, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, William T. Harter and Sharon Wooden Richard, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

WOODS (Fred), J.—Convicted by jury of second degree murder (Pen. Code[1] § 187, subd. (a)), two counts of attempted murder (§§ 664/187, subd. (a))—each committed with a firearm (§ 12022, subd. (a)(1))—and accessory after the fact (§ 32), appellant contends admitting gang expert testimony and instructional errors require reversal. We find no prejudicial error and affirm.

### Procedural and Factual Background

There being no insufficiency of evidence claim, we summarize the evidence and do so with a perspective favoring the judgment. (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303-304 [228 Cal.Rptr. 228, 721 P.2d 110].)

---

[1]Unless otherwise noted all statutory references are to the Penal Code.

This is a gang, drive-by shooting case. The victims lived in Lynwood, Banning Street Gang territory. The perpetrators were members of a rival gang from Compton, the Bario Los Padrenos (BLP) Gang.

The events occurred Christmas Eve, December 24, 1989. Appellant, 19½ years old and a member of BLP, went to a party in Compton. But, finding it boring, he left about 9 p.m. with another gang member, Raymond Vasquez. The two had been friends for three years and lived on the same block. Raymond, about 17 years old, had been a gang member for at least 3 years and was called "Little Man." Appellant and Raymond "had done graffiti" together and appellant had been with Raymond when he had "hit people up," i.e., asked their gang affiliation and declared his own. Appellant knew Raymond was violent.

The two of them, appellant and Raymond, were gone from the party for about two hours. Appellant testified they "cruised" and played some arcade games. They returned approximately 11 p.m.

After a short time they left again, this time with 3 girls, Sylvia and Martha, each 16 years old, and Connie, 14 years old.

Appellant drove his blue Buick Regal. Raymond sat in front, on the right. Connie sat between them. Sylvia and Martha sat in the rear. They drove a short distance to Long Beach Boulevard and picked up another BLP Gang member, Sparkey. He sat in back.

Appellant then drove to Banning Street Gang territory in Lynwood. It was about 11:20 p.m. when they drove by a house on the corner of Banning and Peach. Sylvia called out that "there's some guys from Banning." Appellant testified that Raymond couldn't keep his eyes off them, looking back, and staring—but said nothing.

Without anything being said, appellant drove past the house, went to the corner, turned right and turned right again. Connie asked Raymond where they were going and he told her to ask appellant. Connie did. Appellant didn't answer. Connie asked him five or six times but still got no response. As appellant again approached the corner house he slowed, turned off his lights, and stopped in the driveway.

Raymond leaned out his window and screamed "Where you Vatos from?" When there was no answer, he asked again. One of the nearby men then answered, "Banning." Raymond replied, "Fuck Banning." He then stated, "Barrios Los Padrenos," pulled out a .38-caliber pistol, extended both arms through the window, and fired six shots.

Two bullets hit Antonio Gonzales, one in the chest, one in the stomach. He died within three hours.

Two bullets hit Martin Camorlinga. A third man, Solomon Rodriguez, was about 25 feet away from the car when the shooting started. He started to run, trying to hide, but also was shot twice.

Appellant immediately drove away. After a short distance he turned his lights on. There was little conversation but Sylvia and Raymond did talk about the shooting. According to Martha, Raymond was "scared" and "couldn't believe he did it." Raymond and Sylvia "were just laughing."

Although appellant, Connie, and Martha all testified, none related any postshooting conversation between appellant and Raymond, or *any* statement—of surprise, disapproval, or otherwise—by appellant.

Appellant drove to a park in Bell Gardens, stopped briefly, and then took each of the others home.

When asked why he hadn't called the police during the month before he was arrested, appellant said he had forgotten about the shooting "because I was too busy working."

Also, on cross-examination, when asked if he was surprised by Raymond's first shot, appellant testified, "Yes. I thought he was going to shoot once. But he shot couple—he shot more than once."

## DISCUSSION

1. *Appellant contends the trial court erred in admitting certain expert gang testimony.*

To provide context for appellant's numerous contentions concerning the admissibility of expert gang testimony, we set forth in detail not only that testimony but appellant's trial objections and the court's rulings.

Deputy Sheriff Loy Luna was called as a prosecution gang expert witness. He testified to being presently assigned to "Operations Safe Street Team," a gang unit in the sheriff's Lynwood station. He had also worked in other specialized units exclusively dealing with gangs, such as the gang enforcement team. He had worked patrol for seven years. As part of his experience he had investigated "well over 4[00] or 500 gang-related crimes" and had "personally arrested well over 500 active gang members." He had "come

across" "well over a thousand" gang members, was familiar with both the BLP Gang and the Banning Street Gang, and had investigated approximately 30 drive-by shootings. He had also taken a 40-hour class on gang subculture.

Appellant made no objection when Deputy Luna was called as a witness or during the establishment of his qualifications as a gang expert.[2] Appellant's first objection, on "relevancy" grounds, was to this prosecutor question: "Deputy Luna, based on your training and experience, would you describe for the jury how a typical drive-by shooting occurs."

Before ruling, the court had a lengthy bench conference with counsel. The prosecutor stated the evidence was offered for motive and intent. Appellant objected on relevancy and lack of foundation grounds. The court *sustained* appellant's objection, ruling a sufficient foundation had not been established.

The prosecutor then resumed her examination and Deputy Luna, *without objection*, testified that there *is* a typical gang drive-by shooting. He described it this way: "Typically done with the use of a vehicle. Usually there's two or more people within the vehicle. And certainly [ ] a neighborhood or specific target of people are sought out and accomplished by driving into that neighborhood, which is usually a rival gang neighborhood, finding the target and using whatever firearms that they have available and shooting at the intended target or victim and then driving away from the location."

Deputy Luna further testified that "sometimes" during a drive-by shooting words are exchanged. When he began to describe the words, stating "Usually, it's related to the particular—," appellant interposed this objection: "Object, your Honor, on the grounds of that's not—out of his expertise if he didn't say it's typical." The trial court properly overruled this objection.[3] Deputy Luna answered that question and the following, unobjected to, questions:

"The Witness: Usually, it's something within the nature of a gang slogan or either the persons that are doing the shooting are identifying themselves from a particular gang in calling out to the rival gangs using profanity against them.

---

[2] Evidence Code section 720 provides: "(a) A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert. [¶] (b) A witness' special knowledge, skill, experience, training, or education may be shown by any otherwise admissible evidence, including his own testimony."

[3] Contrary to appellant's objection, testimony based upon Deputy Luna's gang experience, whether or not they were "typical," would be *within* his expertise.

"Q.   What's the purpose of either calling out to a rival gang member or stating your own gang?

"A.   Well, the purpose is they want the—well; from what I understand, they want the notoriety that they, in fact, did commit the drive-by when they usually yell out their own—their own gang slogan or whatever. It's to let the victim know that they are a rival gang; their rival gang is the one that actually did the shooting so there's no mistake about it.

"Q.   Deputy Luna, what does the phrase 'where you from' mean?

"A.   The phrase generally means 'what gang are you from; what neighborhood are you from?'

"Q.   Deputy Luna, what—what reasons would there be for a rival gang to go into another gang's territory that you know of?

"A.   Well, primarily, from what I have experienced, would be to commit some kind of an assault or some type of crime.

"Q.   And what do you mean by crime?

"A.   Well, if there's no target or victim out—standing out in the neighborhood or whatever, occasionally they will bring out their spray paint cans and deface the property in the rival neighborhood or cross out the rival gang's neighborhood writings that's already on the walls.

"Q.   And what does the crossing out of a gang name mean?

"A.   Basically a form of disrespect towards that rival gang. And the crossing out usually means that they intend to—to kill anybody from that particular gang.

"Q.   Would you say it was like a challenge?

"A.   Yes."

The next question by the prosecutor was a lengthy hypothetical one. It recited testimony describing the drive-by shooting and asked: "What would be your opinion of this incident?"

Appellant objected: "Your Honor, I will object on the grounds of it's outside his expertise. Calls for speculation. Phrased to provoke the jury. Not a proper argument." The trial court sustained appellant's objection, observing "It is also vague."

Then, at prosecutor request, another protracted bench conference occurred. During this conference the trial court made clear that whether or not a hypothetical question was proper depended upon "What question you [the prosecutor] ultimately put to the expert." No question about *appellant's* intent would be permitted.

After this bench conference, the following two questions were asked and answered.

"Q. Deputy Luna, do you remember the hypothetical that I gave you?

"A. Yes.

"Q. Okay. Would you have an opinion as to whether that was a typical drive-by shooting?

"A. Yes, I would."

Apparently believing, erroneously, that she had elicited Deputy Luna's opinion, the prosecutor turned to a different subject. Without objection, this question was asked and answered:

"Q. Okay. Based on your training and experience, could you tell us the association between a driver and a passenger shooter during a drive-by shooting?

"A. Well *in most cases that I have dealt with*, at least, the driver's purpose is what it—what it states [*sic*] is that he takes the passenger or whoever was going to commit the assault to an area of where the target is or victim is which is usually some rival gang neighborhood. And his purpose is to basically get him into the neighborhood and to get him out safely and hopefully elude law enforcement if law enforcement was nearby or happens to be in the area." (Italics added.)

The prosecutor's next question shifted focus away from Deputy Luna's personal experience. The following occurred:

"Q. Deputy Luna, let me ask you. Is it common for a—in your training and experience, *has it been common for a driver not to know what his passenger was going to do in gang-related shootings?*

"[Defense counsel]: I object, your Honor, on the grounds that that calls for speculation. No foundation that he has knowledge as to what all the drivers know.

"The Court: Sustained." (Italics added.)

The objection having been sustained, the prosecutor refocused her questions, again asking Deputy Luna about his personal experiences.

"Q.   Well, have you talked to both drivers and shooters in your investigations of drive-by shootings?

"A.   Yes, I have.

"Q.   And when you talk to them, do you talk about particular shootings and methods of how they go about planning a shooting?

"A.   Yes.

"Q.   *And based on your training and experience with these particular types of drive-by shootings,* have you known—let me put it simpler—for the driver to not know what his passenger was going to do?" (Italics added.)

To this last question appellant objected as follows: "Your Honor, again I'll object on the same grounds." The court clarified that appellant's objection was "improper foundation," and overruled the objection.

Deputy Luna then answered "No" and, without further objection, testified: "In other words, I haven't come across, at least in the cases that I have investigated where the—the driver hasn't any knowledge that the passenger was, in fact, going to commit an assault or do a drive-by shooting. Usually the drivers had knowledge. They either planned it in advance or thought upon it real quickly or just acted and driver did his part by driving the passenger or whoever into the rival gang neighborhood."

Appellant's arguments concerning this expert testimony are numerous and lengthy (44 pages of his briefs are devoted to this subject). He contends the trial court erred in admitting this testimony because: (1) it is irrelevant, (2) it is irrelevant that drive-by shootings have a common pattern, (3) it is irrelevant as proof of appellant's intent, (4) gang behavior is not a subject of expert testimony, (5) the testimony did not satisfy *Kelly-Frye* standards[4], (6)   Deputy Luna was not a qualified expert, (7) information from gang members is too unreliable upon which to base expert opinion, (8) it was inadmissible character evidence, (9) the trial court failed to exercise its Evidence Code section 352 discretion, and (10) it denied appellant due process of law.

---

[4]But see *People* v. *Stoll* (1989) 49 Cal.3d 1136, 1154-1161 [265 Cal.Rptr. 111, 783 P.2d 698].

■ We do not decide the merits of any of these contentions because appellant did not object to the admitted evidence on any of these grounds. (Evid. Code, § 353; *People* v. *Rogers* (1978) 21 Cal.3d 542, 547-548 [146 Cal.Rptr. 732, 579 P.2d 1048]; *People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 762 [239 Cal.Rptr. 82, 739 P.2d 1250].) Of his five objections, three were sustained including his only "relevancy" objection. His other two objections were "beyond expertise" (see fn. 3, *ante*) and "improper foundation." This last objection was properly overruled because the objected-to-question was restricted to Deputy Luna's personal experience investigating drive-by shootings.

Appellant's contention is not well taken.

2. *Appellant contends the trial court committed Ireland error.*

■ Appellant contends, and respondent concedes, the trial court committed *Ireland* (*People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]) error. We agree.

The trial court gave CALJIC No. 8.34[5] which erroneously instructed the jury, in appellant's words, "that it could convict appellant of second degree felony-murder if it found that the killing occurred during the commission of assault with a firearm."

However, the court correctly instructed the jury concerning other theories of second degree murder. "In such circumstances, the applicable rule on appeal is clear: reversal is required only if the reviewing court cannot determine from the record on which theory the jury relied." (*People* v. *Sanders* (1990) 51 Cal.3d 471, 509 [273 Cal.Rptr. 537, 797 P.2d 561]; see also *People* v. *Sedeno* (1974) 10 Cal.3d 703, 720-721 [112 Cal.Rptr. 1, 518 P.2d 913]; *People* v. *Kelly* (1992) 1 Cal.4th 495, 530-531 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

The facts of the instant case are indistinguishable from *People* v. *Walker* (1988) 47 Cal.3d 605 [253 Cal.Rptr. 863, 765 P.2d 70]. The court, in considering a similar instructional error, stated: "Three persons were shot—Vasquez, Romero and Zamora. Only Vasquez died. Defendant was charged

---

[5]"If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of assault with a firearm, a felony inherently dangerous to human life, all persons, who either directly and actively commit the act constituting such crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the second degree, whether the killing is intentional, unintentional, or accidental."

with two counts of assault with intent to commit murder for the shootings of Romero and Zamora. The jury was instructed that this crime requires express malice. Express malice, in this context, necessarily includes an intent to kill. The jury verdicts finding defendant guilty on both counts thus determined that he intended to kill Romero and Zamora. The evidence manifestly shows a single intent as to all three victims in the liquor store shootings; it is inconceivable the jury would find that defendant intended to kill only the victims who survived, but not the one who died." (Internal quotations omitted.) (*Id.* at pp. 633-634.)

As in *Walker*, the trial court instructed the jury that appellant could only be convicted of attempted murder if "the person committing such act harbored . . . a specific intent to kill. . . ." By its two guilty-of-attempted-murder verdicts, the jury determined Raymond harbored this intent. Also as in *Walker*, it is "inconceivable the jury would find that [Raymond] intended to kill only the victims who survived, but not the one who died." (47 Cal.3d at p. 634.)

We conclude the *Ireland* error was harmless.

3. *Appellant contends the trial court erred in giving CALJIC No. 3.02.*

■ The trial court gave CALJIC No. 3.02, instructing the jury: "One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but is also liable for the natural and probable consequences of any criminal act that he knowingly and intentionally aided and abetted. You must determine whether the defendant is guilty of the crime originally contemplated, and, if so, whether the crime charged in Counts 1, 2, and 3 was a natural and probable consequence of such originally contemplated crime."

Appellant contends it was error to give the instruction for two reasons. First, it was inapplicable. Second, it removed malice aforethought from second degree murder. Appellant is mistaken.

The instruction was applicable because the jury could have found appellant knew Raymond had a gun and knew Raymond intended to shoot at people, but did not know that Raymond intended to kill anyone. The instruction accurately informed the jury that appellant's liability was not limited by his own knowledge but, rather, extended to the " ' "natural and probable consequences of any [criminal] act" ' " he knowingly aided Raymond in committing. (*People* v. *Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392]; *People* v. *Garrison* (1989) 47 Cal.3d 746, 777-778 [254 Cal.Rptr. 257, 765 P.2d 419]; *People* v. *Hammond* (1986) 181 Cal.App.3d 463, 467-470 [226 Cal.Rptr. 475].)

*4. Appellant contends CALJIC No. 3.02 violates due process.*

Expanding upon his previous contention concerning the same instruction, appellant makes a scholarly attack upon the "natural and probable consequences doctrine." Since the California Supreme Court has rejected appellant's argument (*People* v. *Croy, supra,* 41 Cal.3d 1, 12, fn. 5; *People* v. *Garrison, supra,* 47 Cal.3d 746, 777-778) we are powerless to accept it. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].)

*5. Appellant contends the trial court erred in failing to define "conspiracy."*

█ Appellant contends the trial court had a sua sponte duty to define "conspiracy" as that word was used in the CALJIC No. 8.33[6] instruction it gave the jury.

*People* v. *Earnest* (1975) 53 Cal.App.3d 734, 744-745 [126 Cal.Rptr. 107] found it harmless error to omit a conspiracy definition when conspiracy was not separately charged but was relied upon to admit the hearsay statements of coconspirators. No such statements were received in the instant case.

*People* v. *Williams* (1988) 45 Cal.3d 1268, 1314-1315 [248 Cal.Rptr. 834, 756 P.2d 221] held that since "the word 'conspiracy' was used in its common and nontechnical meaning of an agreement to do harm" there was no sua sponte duty to define it.

The only difference between the ordinary meaning of conspiracy and its legal meaning is the latter's inclusion of *overt act* (in furtherance). (*People* v. *Earnest, supra,* 53 Cal.App.3d 734, 744-745). Because the commission of an overt act (in furtherance of any conspiracy between appellant and Raymond) was undisputed, its omission from a "conspiracy" definition, even if the trial court had a duty to give one, was without prejudice.

*6. Appellant contends the trial court erred in failing to define "assault."*

█ Appellant states: "Although the court instructed the jury that it could find appellant liable for second degree aiding and abetting felony-murder, or

---

[6]"If two or more persons conspire together to commit a felony inherently dangerous to human life, namely, assault with a firearm, and if the life of another person is taken by one or more of them in furtherance of the common design, and if such killing is done to further that common purpose or is an ordinary and probable result of the pursuit of that purpose, all of the co-conspirators are deemed in law to be equally guilty of murder of the second degree, whether the killing is intentional, unintentional, or accidental."

conspiracy felony-murder, if appellant aided and abetted an assault with a firearm, or conspired to commit assault with a firearm, the court omitted to instruct the jury on the elements of an assault." Appellant contends the omission was prejudicial error. We disagree.

Appellant's argument hinges on the difference between the everyday meaning of "assault" and the law's inclusion of "with a present ability" (§ 240) in its definition. This distinction was without significance in the instant trial because appellant was not separately charged with assault, "with a present ability" was undisputed (six shots were fired and all six bullets caused injury), and by their verdicts the jury necessarily determined Raymond had "present ability" to commit violent injuries. (*People* v. *Garrison*, *supra*, 47 Cal.3d 746, 777-778.) Any error was harmless.

7. *Appellant contends the trial court erred in failing to give CALJIC No. 6.15.*

■ The trial court instructed the jury concerning second degree felony murder in pursuance of a conspiracy. (CALJIC No. 8.33; see fn. 6.) Appellant contends it should also, sua sponte, have given CALJIC No. 6.15: "No act or declaration of a conspirator that is an independent product of his own mind and is outside the common design and not a furtherance of that design is binding upon his co-conspirators, and they are not criminally liable for any such act."

We hold the trial court had no sua sponte duty to give CALJIC No. 6.15. (*People* v. *Brigham* (1989) 216 Cal.App.3d 1039, 1046-1047 [265 Cal.Rptr. 486].)

The factual issue in the instant trial was simple. The prosecution argued appellant knew Raymond had a gun and intended to use it. Appellant testified he did not know Raymond had a gun. Unlike *Brigham*, there simply was no issue of a last-second "independent" criminal act by the coconspirator. If appellant sought instructional insulation against such a covert possibility it was his duty, not the trial court's, to formulate such an instruction.

8. *Appellant contends the trial court erred in failing to instruct the jury to view with caution evidence of his oral admissions.*

On cross-examination, the prosecutor asked appellant if he had told the arresting officers he "had loaned [his] car out on Christmas Eve?" Appellant answered that he told the officers he had loaned "it to Raymond for a while and then he came back." Further minimizing the significance of this difference between the two versions was Detective Morgan's testimony that

appellant also stated, "in one flow of time," "I was cruising with some girls that night. I didn't know what Little Man was going to do."

■ Appellant contends it was error for the court not to instruct, sua sponte, that "Evidence of an oral admission of a defendant should be viewed with caution." (CALJIC No. 2.71.) We believe there was no sua sponte duty to give this cautionary instruction, but, in any event, its omission was without prejudice.

Neither version of appellant's extrajudicial statement to the arresting officers constituted a traditional "admission."[7] To the contrary, the prosecution's version was facially exculpatory and appellant's version was guilt-neutral. More to the point, it was undisputed that whichever version appellant had made he had simultaneously stated "I was cruising with some girls that night. I didn't know what Little Man was going to do."

This, we believe, explains why neither party requested an admission instruction or its cautionary appendage. Because appellant's extrajudicial statements to the arresting officers were virtually inextricable, a *cautionary* instruction would have emasculated the possible effect of his exculpatory "I didn't know what Little Man was going to do" statement. Given the nature of these extrajudicial statements, we conclude the trial court was not required, sua sponte, to instruct the jury that "Evidence of an oral admission of the defendant should be viewed with caution." (See *People* v. *Heishman* (1988) 45 Cal.3d 147, 166 [246 Cal.Rptr. 673, 753 P.2d 629].)

*9. Appellant contends the trial court erred in failing to give CALJIC No. 2.13.1.*

■ Appellant contends the court should have given CALJIC No. 2.13.1. It states: "If you find that a defendant, following arrest, made [a statement] [or] [statements] to a law enforcement officer or officers, inconsistent with [such] defendant's trial testimony, the out-of-court [statement] [or] [statements] should be considered by you only for the purpose of testing [such] defendant's credibility as a witness. You must not consider the statement as evidence of guilt.

"[Evidence of an oral out-of-court statement of the defendant ought to be viewed with caution.]"

---

[7]CALJIC No. 2.71 defines an admission as "a statement made by a defendant other than at his trial which does not by itself acknowledge his guilt of the crimes for which such defendant is on trial, but which statement tends to prove his guilt when considered with the rest of the evidence."

This contention is based upon the assumption that appellant's statement to the arresting officers was made in violation of *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) and was admissible only for impeachment. The assumption is mistaken.

The prosecutor, during cross-examination of appellant, attempted to elicit the "I had loaned [my] car out on Christmas Eve" statement but failed. First, she got bogged down by being unable to establish a *Miranda* foundation. Then she was confronted by appellant's denial.

Ultimately, the prosecutor called Detective Morgan who established that appellant's statements were spontaneous, and thus not violative of *Miranda*. Defense counsel did not challenge the full admissibility of appellant's statements. In fact, his brief cross-examination of Detective Morgan emphasized that appellant *had* stated "I didn't know Little Man was going to do it."

CALJIC No. 2.13.1 was inapplicable and properly not given.

10. *Appellant contends the trial court erred in giving CALJIC No. 2.03.*[8]

This contention, like the previous one, assumes appellant's extrajudicial statements were made in violation of *Miranda*. As we have explained, this assumption is mistaken.

11. *Appellant contends the cumulative effect of the "multiple" errors was prejudicial.*

We conclude that the few trial court errors were neither singly nor cumulatively prejudicial.

The factual issue was a simple one: did appellant know Raymond had a gun and intended to use it? No trial court error impacted this issue.

#### DISPOSITION

The judgment is affirmed.

Lillie, P. J., concurred.

---

[8]"If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crime[s] for which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination."

**JOHNSON, J.**—I concur in the judgment and write separately only to emphasize I do so solely because I agree appellant did not adequately preserve his objections to the rather sweeping testimony of the "gang expert." Had the proper objections been made at the appropriate times, they would have raised serious questions about the admissibility of certain aspects of that testimony.

A petition for a rehearing was denied July 29, 1992.