[No. S004350. Crim. No. 21707. Dec. 27, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
MARVIN PETE WALKER, JR., Defendant and Appellant.

608

610

614

616

COUNSEL

Ronald W. Rose, Mark A. Arnold, Carleen R. Arlidge and Rose & Arnold for Defendant and Appellant.

Jean R. Sternberg as Amicus Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Gloria F. DeHart, C. K. Thompson, Jr., Dane R. Gillette and Kristofer Jorstad, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**EAGLESON, J.**—Defendant Marvin Pete Walker, Jr., was convicted of first degree murder and other crimes stemming from two separate incidents joined for purposes of trial. In the first incident, during commission of a liquor store robbery, three people were shot, including a 15-year-old boy, Joseph Vasquez, who died as a result. In connection therewith defendant was convicted of the first degree murder of Vasquez (Pen. Code, § 187);[1] two counts of assault with intent to commit murder upon Andy Zamora and Jerry Romero (§ 217); and robbery of Romero (§ 211). The jury found that defendant personally used a firearm in the commission of each offense. (§ 12022.5) One special circumstance under the 1978 death penalty law (§ 190.1 et seq.) was found true: that the murder was committed while defendant was engaged in the commission or attempted commission of robbery. (§ 190.2, subd. (a)(17)(i).)

In the second incident, also during the commission of a robbery, defendant sexually molested, beat and twice shot a young woman, Rose Olveda, in the head. She survived. In connection therewith defendant was convicted of assault with intent to commit murder (§ 217) and robbery (§ 211) with

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

personal use of a firearm in the commission of each offense (§ 12022.5), and theft of Olveda's vehicle. (Veh. Code, § 10851.)

The jury fixed the penalty at death; this appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).) We filed an initial opinion in this case on December 31, 1985, affirming the judgment of guilt and reversing penalty. Thereafter, we granted a rehearing when it became clear that the People had not been afforded a full and fair opportunity to address, brief and argue the merits of one of the penalty phase errors upon which reversal was predicated. We subsequently authorized the California Appellate Project to file an amicus curiae brief on defendant's behalf. We shall address the various claims of guilt and penalty phase error raised by defendant as well as amicus curiae. For the reasons set forth hereafter, we affirm the judgment in its entirety.

## I. Guilt Phase

### A. Facts

#### 1. *The Liquor Store Incident.*

Near closing time on August 6, 1979, defendant, accompanied by a second man, entered Dan's Bottle Shop in San Jose. Present were co-owner Jerry Romero and two young employees, Joe Vasquez and Andy Zamora, who was mentally retarded. Defendant drew a handgun from his waistband, announced that it was a holdup, warned Romero not to do anything or he would be shot, then marched the three into the back room. He ordered Romero to open the safe. Romero, fearing defendant would become enraged if he found the small amount of petty cash kept in the safe, replied that he did not have the combination. Defendant responded by grabbing a claw hammer and exclaiming, "If you don't open the safe I'm going to hit you with the hammer." The second robber told defendant to "wait a minute" and asked for Romero's wallet. After unsuccessfully searching the wallet for the combination, he told defendant, "He doesn't know it, just forget it." Defendant's companion returned the wallet to Romero.

At that moment the bell on the front door sounded, indicating that a customer had entered the store. Defendant ordered Vasquez to wait on the customer, warning that if he made any "funny moves" he would be shot. Defendant climbed on top of the storage shelves to watch Vasquez, who waited on the customer and returned to the back room.

Defendant and his companion next ordered the group to the front of the store. Defendant opened the cash register and removed approximately $150.

His companion said, "Come on. We got the money. Let's get out." Defendant replied, "No. We're not going to leave any witnesses."

Defendant again marched Romero, Vasquez and Zamora into the back room at gunpoint. As they entered, Romero observed defendant hand the gun to his companion. Romero testified that throughout the ordeal the second robber, who "had a very boyish look to his face," exhibited no violent behavior; "[h]e was very passive. Very calm. That's one of the reasons I—I really thought that we weren't going to be harmed the way we were." At no time did Romero observe the second robber pointing or brandishing the weapon. Defendant then hit Romero across the forehead with a full wine bottle. As Romero fell to the floor, defendant struck him again over the head with a second full bottle of wine. Romero lay on the floor, holding his breath and pretending to be dead. Defendant took Romero's wallet from his back pocket, then felt Romero's back and said, "We don't have to worry about this guy any more."

Defendant walked toward Vasquez and Zamora and ordered them to "Get on your knees." The two youths complied. Romero, still conscious, testified he heard the boys crying and pleading for their lives. Three shots were then fired in rapid succession. Neither Romero nor Zamora directly observed who fired the shots. Joe Vasquez died of a .32 caliber gunshot wound which entered his forehead and exited through the back of his head. Andy Zamora was also shot in the head but survived. Romero was shot in the abdomen; the bullet ricocheted off his hip and traveled through several major organs, lodging in his chest.

As defendant and his companion fled, Romero heard the customer bell go off and the sound of a bottle breaking in the front of the store.[2] He got up, saw the two boys lying in pools of blood, went to the rear door which opens into the parking lot, and saw defendant getting into a car in which the second robber was already seated. A resident of an adjacent apartment testified he heard gunshots and then saw two Black men leave the liquor store and get into what appeared to be a rust or tan-colored Chevy Nova with heavy oxidation. The witness identified a picture of defendant's car as being of the same body style, color and condition of the robbers' vehicle.

Both Romero and Zamora positively identified defendant at trial; Romero had previously identified him at a physical lineup. Another witness, William Cisco, testified that at a party in late September 1979, he had heard defendant talking about his involvement in a robbery. Defendant said that

---

[2] The jury acquitted defendant of assault with intent to commit murder of Enrique Guerrero, who had inadvertently entered the store during the robbery and had been struck over the head and knocked semi-unconscious by an individual he was unable to identify.

during the robbery "some punk got in the way," and so he "took him out of the game." Defendant had a gun tucked in his waistband at the time he made the statement.

### 2. The Assault Upon Rose Olveda.

Late in the evening of September 5, 1979, defendant entered a medical building in San Jose and pointed a gun at 20-year-old Rose Olveda, who was working late. Although he was wearing a ski mask, Olveda positively identified defendant as her assailant at a physical lineup and at trial. Defendant ordered Olveda to open the safe. She replied that there was no safe. He then ordered her into the back room where he demanded her money and car keys. She handed him $11 and the keys. He told her to lie down so he could tie her up, but he could find nothing with which to tie her. He ordered her to stand up, ripped open her blouse, and touched her breasts. He then began pistol-whipping her about the head, striking her an estimated 12 times before she was able to momentarily break away and run for the door. Defendant pulled her back and continued beating her, injuring her back and fracturing her neck. Olveda finally fell to the floor, pretending to be unconscious. Defendant then shot her twice in the head—once through the left ear, the bullet traveling through her head and jaw and lodging in her neck; and once through the left eye, the bullet traveling downward and lodging in her throat. Although she miraculously survived, Olveda lost her left eye and the hearing in her ear as a result of the attack.

### 3. The Subsequent Investigation.

Within five hours after the assault upon Olveda, the police located her car parked in a carport less than a block from defendant's sister's residence where he sometimes stayed.

During 1979, Officer Evan ("Danny") MacIvor was operating a "sting" operation in an undercover capacity in San Jose. MacIvor fronted as a businessman who purchased stolen property. On September 26, 1979, defendant contacted MacIvor and sold him a .32 caliber semiautomatic pistol, telling MacIvor that the gun belonged to him. After arranging to meet with defendant again on September 28, MacIvor turned the gun over to the police department crime lab. Joe Vasquez had died from a .32 caliber gunshot wound to the head. Through comparison with the spent .32 caliber bullet casings recovered at both the liquor store and the office in which Olveda was attacked, a criminalist was able to positively identify the gun as the weapon used in the murder of Vasquez and the shootings of Romero, Zamora and Olveda.

When MacIvor and defendant met again on September 28, MacIvor told defendant that the gun did not work. Defendant responded that the gun did indeed work and had made a lot of money for him in the last six months. Defendant also told MacIvor to be careful not to get caught with the gun because it "had done a murder." When asked what he meant, defendant replied that the gun originally belonged to a friend who had killed someone with it, and that the friend was now serving time in Soledad prison.

When the two next met on October 2, MacIvor secretly recorded their conversation. Defendant told MacIvor that the weapon had been used eight months previously in a murder in Salinas, and that the person responsible was currently serving time for it.[3] MacIvor asked him why he kept the gun for eight or nine months. Defendant replied that the murderer had called him on the phone, told him the gun was in his room, and asked him to get rid of it. Defendant claimed he subsequently picked up the gun, oiled it down, and buried it in his mother's backyard. The gun did not appear to MacIvor to have been oiled or buried in the ground; a criminalist testified he saw no evidence that the gun had recently been buried or oiled down.

### 4. *Defense.*

The defense attempted to impeach the eyewitness identifications through cross-examination of the witnesses on the various details of their descriptions of defendant and his companion. Defendant testified on his own behalf, denying any complicity in the murder of Joe Vasquez or the assaults and attempted murders of Jerry Romero, Andy Zamora, and Rose Olveda. He admitted selling the murder weapon to Officer MacIvor, but claimed he had bought it from two men in a blue van. Each statement defendant made on the stand conflicted with his last. His previous statements to MacIvor and the police at later dates were used to impeach his testimony; these statements in turn conflicted not only with his trial testimony but with each other as well. The defense also sought to present an expert witness on the subject of eyewitness identification, but the court ruled the testimony inadmissible.

### B. GUILT PHASE ISSUES

### 1. *Severance.*

 Defendant contends that the trial court erred in denying his motion to sever the counts based on the liquor store incident from the counts stemming from the assault upon Olveda. We disagree.

---

[3] An investigator from Monterey County, however, testified for the prosecution that no homicide had been committed there between October 1978 and May 1979 with a .32 caliber gun.

Section 954 provides in relevant part: "An accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses . . . be tried separately . . . ."

Robbery, murder and assault with intent to commit murder are all offenses of the same class. "[S]ection 954 permits joinder of all assaultive crimes against the person, all of them being considered 'of the same class.' " (*Coleman* v. *Superior Court* (1981) 116 Cal.App.3d 129, 135 [172 Cal.Rptr. 86], cert. den., 451 U.S. 988 [68 L.Ed.2d 846, 101 S.Ct. 2325]; see also *Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 447 [204 Cal.Rptr. 700, 683 P.2d 699].) Hence these offenses were properly joined in the first instance.

■■■ "Since the statutory requirements for joinder were clearly met in this case, [defendant] can predicate error only on clear showing of prejudice." (*Williams* v. *Superior Court, supra,* 36 Cal.3d at p. 447; *People* v. *Smallwood* (1986) 42 Cal.3d 415, 425 [228 Cal.Rptr. 913, 722 P.2d 197].) As we explained in *Williams,* the first step in the analysis is to determine whether the evidence in each case would be admissible in the other. Such cross-admissibility would ordinarily dispel any inference of prejudice.

We conclude that, had there been separate trials, evidence relating to the liquor store incident would have been admissible in the trial for the assault and robbery of Olveda, and vice versa. Other-crimes evidence is admissible to prove the defendant's identity as the perpetrator of another alleged offense on the basis of similarity "when the marks common to the charged and uncharged offenses, considered singly or in combination, logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses." (*People* v. *Haston* (1968) 69 Cal.2d 233, 246 [70 Cal.Rptr. 419, 444 P.2d 91].)

Here, both incidents were committed in San Jose one month apart; both were armed robberies leading to unprovoked deadly assaults; and in both instances defendant entered business premises shortly after 10 p.m., demanded that a safe be opened, marched his victims to a back room, and began his attack with a vicious beating to the victim's head. Then, using the same gun in each instance, he shot the victim in the head while he or she was lying on the floor. We are not persuaded by defendant's argument that several dissimilarities—i.e., that the liquor store incident involved two unmasked robbers, while the assault and robbery of Rose Olveda was commit-

ted by a single, masked assailant—were significant enough to negate the inference of a common design or modus operandi.

In any event, even were we to conclude that evidence of each incident would not have been cross-admissible in the separate trial of charges stemming from the other, it would not follow that the trial court abused its discretion in denying severance. ■ " '[T]he judge's discretion in refusing severance is broader than his discretion in admitting evidence of uncharged offenses. . . .' [A] ruling on a motion to sever is based on a weighing of the probative value as against the prejudicial effect, but in the weighing process the beneficial results from joinder are added to the probative-value side. This requires the defendant to make an even stronger showing of prejudicial effect than would be required in determining whether to admit other-crimes evidence in a severed trial." (*Coleman* v. *Superior Court, supra,* 116 Cal.App.3d at pp. 138-139, quoting *People* v. *Matson* (1974) 13 Cal.3d 35, 41 [117 Cal.Rptr. 664, 528 P.2d 752]; accord *Williams* v. *Superior Court, supra,* 36 Cal.3d at p. 451.)

■ Defendant's showing of prejudice is insufficient to establish an abuse of discretion. Although this was a pre-*Williams* trial, none of the remaining factors detailed in *Williams, supra,* 36 Cal.3d at pages 453-454, militated against joinder. This is not a case such as *Coleman* v. *Superior Court, supra,* 116 Cal.App.3d 129, where there was danger that strong evidence of a lesser but inflammatory crime might be used to bolster a weak prosecution case on a murder charge. Nor does this case resemble *Williams,* where at least one and possibly two relatively weak charges were joined to support each other, raising the danger that the jury would aggregate the evidence to convict on both charges. (36 Cal.3d at p. 453.) Here the prosecution presented overwhelming evidence of defendant's guilt as to both incidents. The surviving victims all positively identified him. Defendant's gun had been used in each incident. In the liquor store incident, defendant's car was identified as the getaway vehicle, while shortly after the robbery and assault of Olveda, her stolen car was located abandoned less than a block from defendant's sister's apartment where he sometimes stayed. Defendant's own statements, particularly those made when he sold the gun to undercover Officer MacIvor, incriminated him in each incident. Finally, this was not a case in which joinder itself rendered defendant death-eligible (see *Williams, supra,* 36 Cal.3d at p. 454); the Vasquez murder carried its own felony-murder special circumstance.[4]

---

[4] Moreover, at the penalty trial for the Vasquez felony murder, evidence of defendant's robbery and attempted murder of Olveda was admissible to establish an aggravating circumstance.

## 2. *Jury Selection Issues.*

### a. *Sequestration.*

■ Defendant contends that the voir dire of each prospective juror regarding "death qualification" should have been done individually and in sequestration. In *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301], we held that in future capital cases this procedure must be followed in order to minimize the potentially prejudicial effects of open voir dire. The rule of *Hovey* was prospective only (*id.*, at p. 80) and therefore does not apply to this trial which commenced prior to the filing of that case. (*People* v. *Holt* (1984) 37 Cal.3d 436, 449 [208 Cal.Rptr. 547, 690 P.2d 1207]; *People* v. *Turner* (1984) 37 Cal.3d 302, 316 [208 Cal.Rptr. 196, 690 P.2d 669].)

### b. *Challenges for Cause.*

■ Two prospective jurors were excused for cause under *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. Defendant maintains that the court erred in excusing one of these prospective jurors: Ms. Holt.

The United States Supreme Court recently modified the *Witherspoon* standard in *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], and we adopted that modification in *People* v. *Ghent* (1987) 43 Cal.3d 739, 767-769 [239 Cal.Rptr. 82, 739 P.2d 1250]. The new standard is whether a juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." (*Wainwright* v. *Witt, supra,* 469 U.S. at p. 424 [83 L.Ed.2d at pp. 851-852].) Prospective juror Holt unequivocally announced her inability to vote for the death penalty, "regardless of what the facts might be in this case[.]" Our review of her voir dire supports the court's determination that she held views regarding the death penalty that would substantially impair the performance of her duties as a juror. She was properly excused.

### c. *Peremptory Challenges.*

■ Defendant contends that the prosecutor's exercise of peremptory challenges against death penalty skeptics—i.e., prospective jurors who, although not excusable for cause under *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, nevertheless expressed reservations about the death penalty—violated *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]. We have repeatedly rejected this argument; there is "no . . . constitutional infirmity in permitting peremptory challenges by both sides on the

basis of specific juror attitudes on the death penalty." (*People* v. *Turner, supra,* 37 Cal.3d at p. 315.)

■ On rehearing, amicus curiae assigns as error the trial court's denial of defendant's motion for a mistrial pursuant to *People* v. *Wheeler, supra,* 22 Cal.3d 258. ■ In *Wheeler* we held that peremptory challenges may not be used to remove prospective jurors solely on the basis of presumed group bias. (Accord, *Batson* v. *Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712].) We defined group bias as the presumption that certain jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic or similar grounds. (22 Cal.3d at p. 276.)

■ Under *Wheeler,* a party who believes his opponent is improperly exercising peremptory challenges for a discriminatory purpose must raise a timely challenge and make a prima facie case of such discrimination. Once a prima facie case has been shown, the burden shifts to the other party to come forward with an explanation that demonstrates other, valid bases for the challenges—i.e., reasons relevant to the particular case on trial (*People* v. *Wheeler, supra,* 22 Cal.3d at pp. 280-282), or as the United States Supreme Court has put it, "a neutral explanation related to the particular case to be tried." (*Batson* v. *Kentucky, supra,* 476 U.S. at p. 98 [90 L.Ed.2d at p. 88].)

It then becomes the duty of the trial court to make "a sincere and reasoned attempt to evaluate the prosecution's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily. . . ." (*People* v. *Hall* (1983) 35 Cal.3d 161, 167-168 [197 Cal.Rptr. 71, 672 P.2d 854].) We have explained that we will "rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination." (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 282.)

■ In the present case, the court concluded that defendant had presented a prima facie case. The prosecutor in turn gave a number of reasons for challenging each of the three Black prospective jurors. He recalled that prospective juror Michael George had come to court in metal-studded leather motorcycle garb, and had related that he had been repeatedly stopped and harassed by San Jose police officers while riding his motorcycle because he fit what he called the "average black man syndrome." Once when George was stopped for speeding, the officer held a gun to his head; George felt this was an excessive display of force, filed a complaint with the San Jose police internal affairs division, and seemed unsatisfied with its

resolution. The prosecutor also recalled that George had volunteered, without being asked, "that he was not comfortable at all with the fact that it was a death penalty situation."

Prospective juror Dorothy King had expressed strong scruples against the death penalty. She also displayed a general antiprosecution bias. She related that the San Jose police had "harassed" her husband by stopping him without sufficient cause. She had served on a jury in a prior homicide case which resulted in the defendant's acquittal. She related that she disliked sitting on a jury in a murder case.

As for the third prospective Black juror, Dorothy Brown, the prosecutor recalled that she was barely able to suppress her apparent amusement when asked about her views on the credibility of police officers. She had founded a group to "counterbalance the popular image of Black people in the media," and showed incredulity and disdain when the prosecutor asked follow-up questions about the group's functions. She believed the San Jose Police Department had followed her husband home every night for a protracted period of time. She stated she could not imagine herself siding with the prosecutor's side of the case.

We are satisfied that the trial court fulfilled its obligation to critically evaluate the prosecutor's explanations. The record supports the court's conclusion that the prosecutor properly exercised his peremptory challenges on grounds of individual bias.[5]

d. *Misleading Voir Dire.*

Several of the prosecutor's questions during voir dire properly implied that the jurors should not let their judgment *at the guilt phase* be swayed by undue pity or sympathy for the youthful defendant or his family members who might be present in the courtroom. Some of the questions, however, may have implied that these considerations would also be improper at the penalty phase. Defendant argues the questions were reversible misconduct, but the lack of an objection waived any such claim on appeal. (*People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].) Moreover, any such error was later cured by instructions that counsel's questions were not themselves evidence or definitive statements of the law,

---

[5] Amicus curiae contends further that under *People* v. *Trevino* (1985) 39 Cal.3d 667 [217 Cal.Rptr. 652, 704 P.2d 719], the trial court erred in accepting the prosecutor's explanations to the extent they took into account the prospective jurors' attire, facial expressions and sneers, audible laughter, snickering and the like. We conclude that the record supports the court's finding of specific bias as to each prospective juror separate and apart from any such factors.

and by the special penalty phase instruction that "pity and sympathy for the defendant would be proper considerations."

■ Defendant also assigns as misconduct the prosecutor's questions put to several prospective jurors about whether they knew what life imprisonment without the possibility of parole "really meant." We reject defendant's claim that the questions constituted reversible *Ramos* error (*People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430]); no "Briggs Instruction" concerning the Governor's commutation power was given in this case, nor was the jury otherwise affirmatively informed of such gubernatorial powers. To the extent the questions invited improper speculation, any error was clearly harmless. They arose at the earliest stage of trial, and the jury was thereafter instructed not to assume the truth of any insinuations suggested by the attorneys' questions.

### 3. *Exclusion of Expert Witness Testimony.*

■ Defense counsel called a professor of psychology, Dr. Craig Haney, as an expert witness to give testimony on the factors that may affect the reliability of eyewitness identification. Dr. Haney planned to identify numerous factors in this case which, in his expert opinion, increased the likelihood of the misidentification of the defendant. He had hoped to expound on various experimental studies which have concluded that persons under stress do not perceive details well, that mistaken identifications may result from suggestion or unconscious influences, that victims of a crime in which a gun is used tend to focus on the gun rather than on the perpetrator, and that many people find it difficult to identify persons of another race. The prosecution objected to the introduction of this testimony, and after an in camera hearing the court ruled that it would be excluded. Although the court agreed that the listed factors may have played some part in the eyewitness identification in this case, it nevertheless concluded that the subject matter of the proposed testimony was common knowledge and would tend to usurp the basic function of the jury. Defendant now contends the court abused its discretion in excluding the expert testimony.

The trial court relied on two Court of Appeal decisions which held that the trial judge did not abuse his discretion in excluding expert testimony on eyewitness identification. (*People* v. *Guzman* (1975) 47 Cal.App.3d 380, 385-386 [121 Cal.Rptr. 69]; *People* v. *Johnson* (1974) 38 Cal.App.3d 1, 6-7 [112 Cal.Rptr. 834].) The court, however, did not have the benefit of our later-filed opinion in *People* v. *McDonald* (1984) 37 Cal.3d 351 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011], wherein we criticized the reasoning of those decisions, and made it clear that in an appropriate case

the exclusion of expert testimony would constitute not only an abuse of discretion, but reversible error. (*Id.*, at p. 376.)

In *McDonald* we held that "in the usual case the appellate court will continue to defer to the trial court's discretion in this matter." (*Id.*, at p. 377.) We also characterized the unusual case in which the exclusion of such evidence may be an abuse of discretion: it is one in which "an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury." (*Ibid.*)

The present case is one in which the trial court had discretion to admit or exclude the expert testimony. Although Dr. Haney offered to identify factors that might suggest the witnesses misidentified the defendant, ample circumstantial evidence linked defendant to the crimes and gave the identifications an independent source of reliability. As we noted earlier, defendant admitted possession of the gun that was used in both incidents; his car was identified as the possible getaway vehicle from the liquor store; Olveda's stolen vehicle was found parked less than a block from where defendant's sister lived; and defendant made numerous incriminating statements both to friends and police. Although the trial court, under these circumstances, had discretion to admit Dr. Haney's testimony, we find no abuse of discretion, and clearly no prejudicial error, in its decision to exclude that evidence.

### 4. *Statements to Undercover Officer MacIvor.*

Defendant contends that his statements made to Officer MacIvor were erroneously admitted at trial because he was unlawfully "entrapped" into making them. He also claims that his Fifth Amendment rights were violated by Officer MacIvor's "interrogation."

As previously noted, during 1979 Officer MacIvor was operating a "sting" operation in an undercover capacity in San Jose in which he posed as a businessman who purchased stolen property. Three weeks after the Olveda assault and robbery, defendant sold MacIvor the handgun which was subsequently determined to be the weapon used in the murder of Vasquez and the shootings of Romero, Zamora and Olveda. Shortly thereafter MacIvor again twice met with defendant; on the second occasion the undercover officer wore a concealed wire and their conversation was tape-recorded. During these meetings defendant made various inculpatory state-

ments: e.g., that the gun belonged to him and had been in his possession for the last six months; that he had "made a lot of money with it" during that period; and that it had "done a murder." Although defendant was arrested on suspicion of possession of other, unrelated stolen property on the same day he sold the weapon to Officer MacIvor, he was only briefly detained and released. Defendant was not in custody during the subsequent meetings with MacIvor, and had not yet been arrested or charged with these crimes.

 Defendant's "entrapment" claim is plainly without merit. Entrapment is a defense to a charged crime. (*People* v. *Barraza* (1979) 23 Cal.3d 675, 688 [153 Cal.Rptr. 459, 591 P.2d 947].) It is not a crime to make incriminating statements to an officer, nor was defendant charged with having done so.

 Defendant's reliance on *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], as authority for suppression of his statements to Officer MacIvor is likewise misplaced. The requirements of *Miranda* apply only when a suspect is in custody. (*Rhode Island* v. *Innis* (1980) 446 U.S. 291, 300 [64 L.Ed.2d 297, 307, 100 S.Ct. 1682].) Defendant was not in custody during his meetings with Officer MacIvor. As in *People* v. *Leach* (1975) 15 Cal.3d 419 [124 Cal.Rptr. 752, 541 P.2d 296], we reject defendant's "rather preposterous contention that the undercover agent should, prior to insinuating himself into the confidences of [defendant], have delivered to [him] the *Miranda* warnings normally required as a concomitant of arrest." (*Id.,* at p. 442.)

5. *Physical Restraints.*

 On rehearing, defendant for the first time contends it was error to allow the jury to see him restrained in handcuffs and a leg brace. The record, however, is unclear as to what types of restraints were used, when they were used, or whether they were apparent to the jury, since defendant never objected below. For this reason, the claim has been waived on appeal. (*People* v. *Taylor* (1982) 31 Cal.3d 488, 495-496 [183 Cal.Rptr. 64, 645 P.2d 115] [failure to object to being tried in jail clothing]; *People* v. *Duran* (1976) 16 Cal.3d 282, 289 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1] [wrist and ankle restraints].)

6. *Prosecutorial Misconduct.*

 Defendant contends that the prosecutor engaged in misconduct requiring reversal of the judgment of guilt. In particular, defendant claims the record reflects the prosecutor made some facial expressions of disbelief when the trial court dismissed a prospective juror for cause, and made an

unsolicited comment about the philosophical leanings of this court during questioning of another prospective juror. Both matters occurred early in the jury selection process and were of a minor, harmless nature. The failure to object waived any claim of misconduct on appeal. (*People* v. *Green, supra,* 27 Cal.3d at p. 27.)

Defense counsel moved for a mistrial on grounds of misconduct when the prosecutor showed the witness who discovered the victims in the liquor store incident a high school yearbook photograph of murder victim Joe Vasquez. The witness reacted briefly with some emotion upon viewing the photograph, and counsel charged that its use was calculated to arouse the jury's sympathy. The record, however, supports the trial court's findings and conclusion that use of the photograph for identification purposes was not misconduct. The prosecutor explained that the photograph, which simply depicted Vasquez in a baseball uniform, was the only one available to him; that its identification by the witness was crucial to demonstrate that the witness could distinguish Vasquez from assault victim Enrique Guerrero (defendant was ultimately acquitted of assault with intent to murder Guerrero); and that he (the prosecutor) had no knowledge or reason to suspect that the witness personally knew Vasquez or would react emotionally upon seeing the photograph. The trial court had discretion to admit the evidence (*People* v. *Thompson* (1988) 45 Cal.3d 86, 114-115 [246 Cal.Rptr. 245, 753 P.2d 37]); nor has misconduct or prejudice been demonstrated.

### 7. *Validity of Felony-murder Rule.*

Defendant urges that California should abandon the felony-murder rule. We have repeatedly rejected the argument and upheld the continuing viability of the rule, and do so again. (*People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697].)

### 8. *Instructions on Assault With Intent to Commit Murder.*

Defendant claims that the jury was erroneously instructed on assault with intent to commit murder because the instructions as a whole may have led the jury to believe it could determine guilt without finding express malice. (See *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 763-765 [175 Cal.Rptr. 738, 631 P.2d 446]; *People* v. *Martinez* (1980) 105 Cal.App.3d 938, 943 [165 Cal.Rptr. 11].)

The contention is meritless. Following instructions on first and second degree murder and on express and implied malice, the jury was instructed that "[t]he defendant is also charged . . . with . . . assault with intent to commit murder, a violation of 217 of the Penal Code. That section provides

that every person who assaults another with the specific intent to commit murder is guilty of the crime of assault to commit murder. [¶] In order to prove the commission of the crime of assault to commit murder, each of the following elements must be proved: [¶] One, that a person was assaulted, and [¶] Two, that the assault was made with the specific intent to murder such person. [¶] *Assault with intent to commit murder requires express malice and a specific intent to murder and not merely the specific intent to kill.* However, the murder which defendant must intend, need only be murder of the second degree." (Italics added.) Thus, the jury was specifically instructed that it must find *express* malice.

Defendant argues that the jurors may have inferred from the reference to second degree murder that a finding of either express *or* implied malice would support a conviction of assault with intent to commit murder. We disagree. The jury should have been able to clearly understand that *express* malice, as directed in the instruction, must be found in order for defendant's conduct to constitute assault with intent to commit murder, and that the reference to second degree murder pertained only to a determination of the fixing of the *degree* of the murder—i.e., that the jury need not determine whether the intended murder, with express malice, would have been fixed at first degree (being premeditated or during the commission of a robbery) or second degree.

9. *Instructions on Accomplice Liability.*

 On rehearing, defendant and amicus curiae argue that the trial court's failure to instruct on intent with regard to accomplice liability for the liquor store assaults requires reversal of those convictions.[6] We disagree.

The standard CALJIC aiding and abetting instructions found deficient in *People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318], were given here. Former CALJIC Nos. 3.00 and 3.01 were erroneous "because they did not advise the jury that conviction as an aider and abettor required not only that the defendant have knowledge of the criminal purpose of the perpetrator of the offense, but also that the defendant share that purpose or intend to commit, encourage, or facilitate the commission of the crime." (*People* v. *Croy* (1985) 41 Cal.3d 1, 11-12 [221 Cal.Rptr. 592, 710 P.2d 392]; *People* v. *Caldwell* (1984) 36 Cal.3d 210, 223-224 [203 Cal.Rptr. 433, 681 P.2d 274]; *People* v. *Beeman, supra,* 35 Cal.3d 547, 560.)

---

[6] Defendant alone robbed and assaulted with intent to murder victim Rose Olveda. This argument is directed solely to the convictions of assaulting with intent to murder Jerry Romero and Andy Zamora during the liquor store robbery, which defendant perpetrated with an accomplice.

We have recently held that prejudice from *Beeman* error is assessed under the *Chapman* "harmless beyond a reasonable doubt" standard of review. (*Chapman* v. *California* (1966) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Dyer* (1988) 45 Cal.3d 26, 60-64 [246 Cal.Rptr. 209, 753 P.2d 1].) Under these facts the *Beeman* error was clearly harmless beyond a reasonable doubt.

It is undisputed that defendant was armed with the handgun upon initiating the robbery of the liquor store. After defendant personally removed the money from the cash register his accomplice stated, "Come on. We got the money. Let's get out." Defendant replied, *"No. We're not going to leave any witnesses."* (Italics added.) Defendant marched the victims back into the rear of the store at gunpoint. He handed the gun to his partner, then twice struck Romero across the head with two full bottles of wine. When Romero pretended to be dead, defendant removed Romero's wallet from his back pocket, felt his back and said, *"We don't have to worry about this guy any more."* (Italics added.)

Neither of the surviving victims directly observed defendant regain possession of the gun or fire the ensuing volley of shots. However, Romero testified that defendant's companion, who "had a very boyish look to his face," remained passive throughout the incident and at no time exhibited any threatening or violent behavior. Romero observed *defendant walk over to Zamora and Vasquez* and order the boys to their knees. As the victims pleaded for their lives three shots were fired off in rapid succession; *Vasquez and Zamora were each shot through the front of the head.* The execution-style shooting clearly evinces an intent to kill. The nature and location of the wounds, together with Romero's testimony, strongly supports an inference that defendant momentarily handed the gun to his companion so he could hit Romero over the head with the wine bottles, then took his gun back, stood in front of his victims and fired the shots.

Defendant used the same handgun several weeks later to rob and twice shoot victim Rose Olveda in the head; the jury concluded from such evidence that he had assaulted her with intent to commit murder. Subsequent to the commission of these offenses defendant remained in possession of the handgun, admitted ownership of it when he sold it to undercover Officer MacIvor, and told the officer it "had done a murder." The jury found that defendant had personally used the gun in connection with the murder of Vasquez, the robbery of Olveda, and the assaults with intent to commit murder upon Romero, Zamora and Olveda.

In short, the undisputed evidence overwhelmingly establishes that defendant personally shot all of his victims and intended to murder each of

them, succeeding in one case. The verdicts and personal gun-use enhancements found true under each count establish that the jury so found; no contrary evidence whatsoever was presented.

## 10. *Felony-murder Robbery Special Circumstance.*

■■■ Defendant contends that the felony-murder robbery special circumstance must be set aside because the court failed to instruct on intent to kill. In *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], we held that intent to kill is an element of the felony-murder special circumstance of the 1978 death penalty law, whether applied to accomplices or to actual killers. (*Id.,* at pp. 153-154.)

We have since overruled *Carlos* in *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], wherein we held that, with respect to the actual killer, the court need not instruct on intent to kill in connection with felony-murder special circumstances. Such an instruction is required only where there is evidence from which the jury could find that the defendant was an accomplice rather than the actual killer. (*Id.,* at pp. 1138-1139.)

Defendant correctly argues that the court erred in failing to instruct that a finding of intent to kill is required for a felony-murder special circumstance as to an accomplice who is not the actual killer. Defendant handed the gun to his accomplice before hitting Romero over the head with the bottles of wine; thereafter neither Romero nor Zamora directly observed defendant shoot Vasquez. Notwithstanding the overwhelming evidence that defendant was the gunman, because accomplice liability instructions were given here, defendant was entitled to an instruction that, under such theory of liability, the felony-murder special circumstance would require proof of his intent to kill.

The error, however, was harmless for all the same reasons which required our rejection of defendant's claim of prejudicial *Beeman* error. (*Ante,* at pp. 631-632.) Absolutely no evidence was presented suggesting defendant did not share the triggerman's purpose to kill all the witnesses to the robbery.

Moreover, the guilty verdicts necessarily reflect that the jury found defendant's intent to kill Vasquez. Three persons were shot—Vasquez, Romero and Zamora. Only Vasquez died. Defendant was charged with two counts of assault with intent to commit murder for the shootings of Romero and Zamora. The jury was instructed that this crime requires express malice. (*Ante,* at p. 631.) Express malice, in this context, necessarily includes an intent to kill. (See *People* v. *Murtishaw, supra,* 29 Cal.3d 733, 764-765.) The

jury verdicts finding defendant guilty on both counts thus determined that he intended to kill Romero and Zamora. The evidence manifestly shows a single intent as to all three victims in the liquor store shootings; it is inconceivable the jury would find that defendant intended to kill only the victims who survived, but not the one who died.

It is virtually impossible to conclude on this record that anyone other than defendant was the actual killer. In any event, the record establishes beyond doubt that defendant acted with intent to kill in this case. Hence, the finding required by *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368], is satisfied. (*Cabana* v. *Bullock* (1986) 474 U.S. 376 [88 L.Ed.2d 704, 106 S.Ct. 689].)

11. *Juror Questions and Instructions on the Firearm-use Enhancement.*

■ Defendant contends that the court inadequately responded to juror questions concerning the allegations of personal firearm use in connection with the liquor store shootings. During deliberations, the jury through its foreman asked whether, in order to find the personal firearm-use enhancement true, it had to be established that defendant personally pulled the trigger, or whether his presence at the crime scene would suffice. The court responded by rereading the applicable paragraphs of CALJIC No. 17.19 (1980 rev.), defining the relevant concepts underlying a section 12022.5 gun-use enhancement. Amicus curiae concedes that the enhancement was correctly defined thusly: "to display a firearm in a menacing manner, intentionally to fire it, or intentionally to strike or hit a human being with it." It is argued, however, that one or more jurors may have remained confused about when the enhancements could be deemed completed under these facts, since defendant *displayed* the gun when he initially confronted and robbed the victims—and at some later point the weapon was *fired* at all three victims. The court responded to a second inquiry[7] by rereading CALJIC No. 17.19 and No. 3.31 (concurrence of act and specific intent).

Defendant and amicus curiae contend the court should have instructed the jury that the gun-use allegation under the murder count could only be found true if defendant *used* the gun to commit the murder, and that his

---

[7] The foreman inquired in this regard: "In the definition of time of commission of offense in this case, it appears there were really two offenses taking place concurrently. There was a murder taking place the same time as a robbery. [¶] Are there any instructions relating to when the murder might begin? [¶] . . . Well, let me preface it by saying I don't think it's a major problem. But we're looking for some clarification on the beginning of a crime. And there are two crimes that are occurring at the same time. I guess the question is: . . . Is the crime defined to have begun when the intent of that crime becomes clear? Or is it only when the act clearly begins?"

earlier display or use of the gun in the commission of a "separate" felony (robbery) would be insufficient to support such a finding—even if he had already formed the intent to kill at that time. Defendant cites no authority for this proposition and it is far from self-evident, the jury having found that defendant murdered during commission of the felony of robbery. Section 12022.5 is intended to distinguish those who are willing to use firearms while committing felonies from those who are not, and to increase the penalty for the former. (*People* v. *Walker* (1976) 18 Cal.3d 232, 240-243 [133 Cal.Rptr. 520, 555 P.2d 306]; *People* v. *Chambers* (1972) 7 Cal.3d 666, 672 [102 Cal.Rptr. 776, 498 P.2d 1024].) Defendant clearly belongs in the first category.

In any event, we need not determine whether further clarifying instructions were in order, for on these facts there could be no prejudice. Defendant expressed a clear desire to leave no witnesses, used the gun to herd his victims into the back room, assaulted Romero in an attempt to kill him, and ordered Vasquez and Zamora to their knees. Even assuming for sake of argument that defendant's companion fired the shots, we do not find defendant's own gun use so separate from the actual shootings that prejudice could be inferred from the court's failure to more fully instruct.

## II. PENALTY PHASE

### A. FACTS

The prosecution and defense stipulated that the evidence from the guilt phase could be considered by the jury in the penalty phase. Only a few additional witnesses testified.

Officer Nichols testified for the prosecution about a conversation he heard through electronic monitoring between defendant and his cousin Lawrence Martin at the police station on September 26, 1979. During the conversation, defendant told Martin that he would have to get the gun from "Danny" (Officer MacIvor), and that "Danny" would have to be "offed."[8]

Officer MacIvor testified that at the conclusion of a preliminary hearing on October 30, 1979, defendant walked by him and the deputy district attorney conducting the hearing, turned toward the prosecutor and stated,

---

[8] Defendant testified he and Martin sold stolen property to Officer MacIvor earlier on this date. This was the same transaction in which defendant sold the handgun used in the instant offenses to Officer MacIvor. Shortly after the sale, defendant and Martin were stopped and detained on suspicion of burglary. While in the police station their conversations were secretly monitored; at that time defendant's alleged threats to get the gun back from "Danny" and kill him were overheard.

"The hell with getting a cop. I'll get me a D.A." The record further suggests that there may have been some mention of the September 26 "Danny" threat in connection with a bail motion made at the conclusion of the preliminary hearing, perhaps thereby prompting defendant's "D.A." threat. The deputy district attorney testified that when defendant walked by, defendant glared at him and made a comment. All the district attorney could make out was "D.A."

The defense presented several family members and friends as witnesses. Defendant's mother testified that defendant, now 21 years old, had grown up in a poor family with 7 brothers and sisters. Defendant worked and helped support the family. Defendant's sisters testified that defendant had helped them financially and emotionally on past occasions. Each wished him to live. A church secretary testified that defendant had done some yard work for her in the past. A friend of the defendant testified that he sometimes drove her to work. Defendant's girlfriend testified that he had helped her emotionally, that she thought he was innocent, and that she loved him and did not want him to die. Defendant testified and denied making the threats to the officer and the district attorney. He claimed he was innocent of the crimes and wished to live.

## B. PENALTY PHASE ISSUES

### 1. *Constitutionality of the 1978 Death Penalty Law.*

 Defendant and amicus curiae contend that the 1978 death penalty law violates the Eighth and Fourteenth Amendments to the federal Constitution because it fails to provide adequate guidance for the jury's exercise of its sentencing discretion, or to require the jury to state in writing its reasons for choosing death. He further argues that the law violates the due process clause by failing to require the jury to find death the appropriate penalty beyond a reasonable doubt. We have repeatedly rejected identical constitutional attacks on each of these asserted grounds. (See *People* v. *Allen* (1986) 42 Cal.3d 1222, 1285 [232 Cal.Rptr. 849, 729 P.2d 115]; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].)

### 2. *Evidence of Death Threats.*

 Defendant contends that evidence of the "D.A." and "Danny" death threats was inadmissible on three grounds: (1) the prosecution failed to give adequate notice of its intent to introduce such evidence in aggravation; (2) the police had a duty to preserve a tape recording of the monitored conversation in which defendant made the "Danny" threat; and (3) neither threat constituted a violation of a penal statute—a

prerequisite for admissibility under section 190.3, factor (b). (See *People* v. *Phillips* (1985) 41 Cal.3d 29, 72 [222 Cal.Rptr. 127, 711 P.2d 423].) ▆▆▆ ▆▆▆ Only the last claim has merit, and then only with respect to the "Danny" threat. Moreover, the erroneous admission of evidence of the "Danny" threat was nonprejudicial.

a. *Notice.*

▆▆▆ Defendant contends that the prosecutor failed to give him proper notice of his intent to offer evidence of the death threats in aggravation at the penalty phase.

Section 190.3 provides in relevant part: "Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial." ▆▆▆ The purpose of the statutory notice is to advise the accused of the evidence against him so that he may have a reasonable opportunity to prepare a defense for the penalty phase of trial. (See *People* v. *Miranda* (1987) 44 Cal.3d 57, 96 [241 Cal.Rptr. 594, 744 P.2d 1127].)

▆▆▆ We are satisfied that there was substantial compliance with section 190.3. The record discloses that the prosecutor told defense counsel even before the case arrived in superior court that defendant had threatened a deputy district attorney and a police officer. In addition, a written notice of the intention to introduce such evidence in aggravation was filed a full week before commencement of the penalty phase. The trial judge conducted a hearing in chambers on the evidence to be admitted at the penalty phase. He personally recalled that from the time he was assigned the case the matter of the prior threats had been discussed in connection with courtroom security concerns. Moreover, defendant cannot be heard to complain that the notice of the October 30, 1979, courtroom threat against the deputy district attorney was lacking in specificity; the record reflects defense counsel was representing defendant at the preliminary hearing and was himself present in the courtroom when defendant uttered the threat. Finally, the record reveals counsel was fully aware of his right to seek a continuance to investigate and respond to any evidence of which he had not been afforded adequate notice. (See *People* v. *Howard* (1988) 44 Cal.3d 375, 419-425 [243 Cal.Rptr. 842, 749 P.2d 279].) A continuance was never sought.

The trial court was satisfied that defense counsel had been afforded adequate notice of the prosecutor's intent to introduce evidence of the threats. We see no reason to reach a contrary conclusion.

b. *Duty to Preserve the Evidence.*

■■■ Shortly after selling the gun to undercover Officer MacIvor ("Danny"), defendant and his cousin were detained at the police station on suspicion of burglary. Officer Nichols testified the two were placed in a room and their conversation secretly monitored. Defendant was overheard to tell his cousin he would have to get the gun back from Danny, and that Danny should be "offed." Nichols testified "off" was a street term for "kill."

At the start of the penalty phase, the district attorney for the first time learned that the conversation at the police station had been tape-recorded as well as monitored. Officer Nichols testified that the threats were audible on the tape, but its quality was very poor because defendant and his cousin had been whispering. A copy of the tape was forwarded to homicide detectives whose attempts to enhance it electronically proved unsuccessful. The homicide detectives thereafter informed Officer Nichols that the tape "was of no value to them." He kept the original for five or six months and ultimately reused it, making no special effort to preserve it for trial. Neither the original tape nor the copy were ever made available to the defense or prosecution during trial.

Defendant contends that under *People* v. *Hitch* (1974) 12 Cal.3d 641, 652-653 [117 Cal.Rptr. 9, 527 P.2d 361], the officers' negligent destruction of the tape should have precluded admission of evidence of the "Danny" threats at the penalty phase. ■■■ The United States Supreme Court has recently formulated its own duty-to-preserve-evidence test in *California* v. *Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528]. Under *Trombetta,* the duty to preserve extends only to evidence which "both possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (467 U.S. at p. 489 [81 L.Ed.2d at p. 422].) ■■■ Here it appears neither prong of the *Trombetta* test was met; defendant made no showing that the tape recording possessed any apparent exculpatory value, nor did he show why his opportunity to cross-examine Officer Nichols, who directly monitored the taped conversation, was inadequate to protect his rights.[9] In any event, as next shown, this claim is effectively mooted by our conclusion that evidence of the "Danny" threats was inadmissible for a more fundamental reason.

---

[9] Indeed, defense counsel argued to the jury that destruction of the tape cast doubt upon the "Danny" threat evidence, and militated against a finding that the threats had been proved beyond a reasonable doubt.

c. *Admissibility of the Evidence.*

 Five years after trial in this case, this court held that "[i]nsofar as section 190.3 contemplates consideration of defendant's criminal history (see [factors] (b), (c)), such evidence 'must be limited to . . . conduct that demonstrates the commission of an actual crime, specifically, the violation of a penal statute. . . .' (*People* v. *Phillips* (1985) 41 Cal.3d 29, 72; see also *Boyd,* [*People* v. *Boyd* (1985)] 38 Cal.3d [762,] at pp. 776-778 [215 Cal.Rptr. 1, 700 P.2d 782].)" (*People* v. *Belmontes* (1988) 45 Cal.3d 744, 808 [248 Cal.Rptr. 126, 755 P.2d 310].)

 Defendant and amicus curiae contend that the courtroom threat, "the hell with getting a cop, I'll get me a D.A.," was not a crime in violation of a penal statute. Respondent asserts it was a violation of sections 69 or 71 (threatening an executive or public officer with intent to deter performance of his duties). We conclude that evidence of the courtroom threat would support a finding of a violation of section 69. Although defendant voiced the threat in a low voice, he turned to face the deputy district attorney when he communicated it. The deputy had just completed conducting a preliminary hearing in which defendant was held to answer, had argued against his release on bail, and was able to hear at least a portion of the threat. Given the murder and assault charges which defendant faced, it could reasonably be perceived that he had the apparent ability to carry out the threat. The evidence thus supports an inference that defendant intended to thwart or deter further prosecution of his case by threatening the deputy district attorney, and each requisite element of a violation of section 69 was shown on these facts. (See *People* v. *Hopkins* (1983) 149 Cal.App.3d 36, 40-44 [196 Cal.Rptr. 609].) Furthermore, the jury was instructed that the threats had to be proved beyond a reasonable doubt in order to qualify as factors in aggravation. (*People* v. *Robertson* (1982) 33 Cal.3d 21, 55 [188 Cal.Rptr. 77, 655 P.2d 279].)

 We agree with defendant that evidence of the *"Danny" threat* was inadmissible under the rule of *Phillips* and *Boyd*. Respondent contends that defendant's statement constitutes solicitation of his cousin Lawrence Martin to assist in a plan to murder Officer MacIvor, a violation of section 653f. But Officer Nichols's testimony concerning this threat does not bear out the claim; the words used by defendant are at best ambiguous and equally supportive of an inference that he was merely relating to Martin how *he* (defendant) would have to get the gun back and "off" Danny.[10]

---

[10] Under other circumstances, evidence of the "Danny" threat may well have been admissible as a "circumstance of the crime" under section 190.3, factor (a)—even though the statement was made several weeks after commission of these offenses. Defendant was making reference in his statement to recovery of the handgun he used to commit these crimes, and to the

We conclude, however, that admission of evidence of the "Danny" threat was nonprejudicial. (Cf. *People* v. *Belmontes, supra,* 45 Cal.3d at p. 809.) This case was tried well before *Phillips* or *Boyd* were decided. The properly admitted aggravating evidence in this case—in particular, the circumstances of the crime (§ 190.3, factor (a))—was simply overwhelming. From that evidence the jury found defendant guilty in one incident of murdering one person and assaulting two others in execution-style shootings of unarmed and unresisting victims, two of whom were teenagers. One month later defendant viciously pistol-whipped a young woman and shot her twice in the head in order to facilitate his escape with her $11 and her car.

The evidence of defendant's threats was dwarfed in comparison to the seriousness and excessive violence of the charged offenses. Nor did the prosecutor place heavy emphasis on the threats in his closing argument. He maintained that they constituted examples of "other criminal activity" involving a threat of violence and should thus be considered in aggravation, but he also cautioned the jury on three separate occasions to ignore the evidence unless they first found beyond a reasonable doubt that the alleged criminal activity had actually occurred. He suggested the threats evidenced a callous and casual attitude toward the value of others' lives, but clearly communicated his belief that this attitude was established primarily by defendant's conduct in the charged offenses and his courtroom demeanor. Finally, the jury knew from the guilt phase that defendant twice met with undercover Officer MacIvor *after* communicating the "Danny" threat to his cousin and being released from custody. There was no evidence defendant ever attempted to make good on his threat. On these facts it would be sheer speculation for us to conclude that evidence of the threat affected the penalty verdict.

3. *Admissibility of Guilt Phase Evidence.*

■ Amicus curiae and defendant assail defense counsel for stipulating to introduction of all the guilt phase evidence at the penalty phase of trial. We find the contention wholly without merit. (See *People* v. *Phillips, supra,* 41 Cal.3d at p. 64; § 190.3, factor (a) [circumstances of the crime relevant to the penalty determination].) ■ The argument that guilt phase evidence of defendant's involvement in burglaries or receiving stolen property was inadmissible at the penalty phase must likewise fail. Evidence of defendant's possession and sale of stolen property was inextricably intertwined in proof of the People's case-in-chief at the guilt phase. In any case, the jury

killing of a witness who could link him to the murder weapon and thus these crimes. Moreover, insofar as defendant denied any complicity in the crimes right on through the penalty phase, evidence of his concern about getting the gun back from "Danny" on the very day he sold it to the undercover officer was relevant for impeachment purposes.

was specifically instructed to disregard any evidence of uncharged criminal activity which was not proved beyond a reasonable doubt or shown to involve a threat or use of force or violence under factor (b).

4. *Instructions on Sympathy and General Character and Background Evidence.*

██ Defendant and amicus curiae argue that the jury was misinstructed on the proper role of sympathy and general character and background evidence in the penalty phase. In reviewing such claim, we examine the instructions and arguments as a whole to determine whether the jury was adequately informed of the proper scope of mitigating evidence for its consideration. (*California* v. *Brown* (1987) 479 U.S. 538, 546 (conc. opn. of O'Connor, J.) [93 L.Ed.2d 934, 943, 107 S.Ct. 837]; see *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 113-115 [71 L.Ed.2d 1, 10-11, 102 S.Ct. 869]; *People* v. *Ghent, supra,* 43 Cal.3d at p. 777; *People* v. *Brown* (1985) 40 Cal.3d 512, 536-537, 544, fn. 17 [220 Cal.Rptr. 637, 709 P.2d 440]; *People* v. *Easley* (1983) 34 Cal.3d 858, 878, & fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].)

We have undertaken such a review here and conclude that the jury was not misled regarding its responsibilty to consider all of the mitigating evidence in the case.

First, the jury was *not* instructed at the penalty phase with the "no-sympathy" language embodied in CALJIC No. 1.00. (Compare *People* v. *Brown, supra,* 40 Cal.3d at pp. 536-537, vacated *sub nom.* California v. *Brown, supra,* 479 U.S. 538 [wherein the high court held that the giving of the California standard anti-sympathy instruction (CALJIC No. 1.00) at the penalty phase is *not* unconstitutional per se].) The jury was specifically instructed that: "[Y]ou were previously instructed you must not be influenced by pity for the defendant or swayed by sympathy for him. I instruct you that in this phase of the case, the penalty phase, pity and sympathy for the defendant would be proper considerations for you should you find them to be warranted in the circumstances."

Next, although the jury did receive an instruction in the literal terms of factor (k) in this pre-*Easley* case (*People* v. *Easley, supra,* 34 Cal.3d 858), our review of the arguments as a whole reinforces our conclusion that, as instructed, the jury must have understood its obligation to consider and weigh all of defendant's mitigating evidence.

After arguing to the jury that "the law is neutral" on what happens at the penalty phase, the prosecutor distinguished the penalty from the guilt phase of trial thusly: "There's a difference, and that difference is that you previously have been told that pity or passion for a defendant, sympathy, that

sort of thing, cannot enter into your deliberations. . . . This [the penalty phase] is the exception. . . . You still cannot look at sympathy or passion or prejudice for the victims in terms of how it would change facts. You can't do that, but you can consider passion or prejudice towards the defendant. [¶] [T]he instruction will say that . . . in this—the penalty phase, pity and sympathy for the defendant would be proper considerations if you should find them to be warranted in the circumstances. *If the defense raises anything in this case,* which you may or may not have heard, any real evidence of so far, that there is a reason for sympathy towards this particular defendant, *then of course that's something for you to weigh and something that you use in looking at the instructions on the case.*" (Italics added.)

Defense counsel told the jury they could "consider Marvin's family as well. They have indicated to you that they have loved Marvin. They wish him to live, albeit in confinement, life imprisonment without possibility of parole. They have indicated to you that Marvin has done some worthwhile acts while he has been on this earth. That he is a human being, that he has done things to help others, that he has been worthwhile in his activities, that he is a person of worth." Defense counsel explained: "The prosecutor indicated that the instruction provides as they do that you can consider passion and pity for the defendant if you find that to be appropriate." Finally, in his closing argument, the prosecutor again argued that defendant's proffered general character and background evidence was worthy of minimal mitigating weight: "Marvin's family felt that he should live. You heard the testimony . . . I would expect a family to say that. The evidence you heard the other day from the defense on Mr. Walker and his good deeds, the thing that stands out that mostly I think about is that there was almost nothing to say. . . . [¶] You're going to have instructions. You'll see how much value that is."

Defendant directs us to the prosecutor's closing remarks in which he stated: "*The mitigating factors are a possibility of two.* And the aggravating factors are all the rest." (Italics added.) However, read in context, we believe the prosecutor was simply arguing his view of the state of the evidence; namely, that defendant's relative youth and his lack of prior convictions were the only two factors *worthy of assignment of any mitigating weight.* Nor do we view the prosecutor's argument under factor (k) as improperly suggesting to the jury that evidence thereunder related solely to the crimes—or that factor (k) evidence could be aggravating. (See *People* v. *Boyd* (1985) 38 Cal.3d 762, 776 [215 Cal.Rptr. 1, 700 P.2d 782].) In his closing argument, the prosecutor discussed the testimony of defendant's family members and friends; including testimony that he had done some favors, loaned them money, done odd jobs for some, and given others rides to work. He never suggested that any evidence, or lack of evidence, regarding defendant's general background and character, was "aggravating."

Rather, he simply urged the jury to accord little mitigating weight to such evidence: "if that's all you can say about somebody, that is very, very thin."

Viewing the instructions and arguments as a whole, we conclude the jury here was adequately informed of the full nature of its responsibility to consider defendant's mitigating general character and background evidence.

### 5. *Davenport Error.*

During his penalty phase argument, the prosecutor reviewed factors (a) through (k) of section 190.3 and argued how in his view the evidence fit under each factor, if applicable. He reviewed the general circumstances of the crimes as aggravating circumstances under factor (a), and urged that evidence of the threats was admissible as a circumstance in aggravation under factor (b). He observed that the absence of prior felony convictions was a mitigating circumstance under factor (c). When he got to factor (d)—whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance—he argued: "[t]here is, of course, no evidence of that." He went on to characterize the manner in which defendant had shot his victims and concluded: "emotional, extreme mental and emotional disturbance on his part, no. Absolutely cold when he did those things. At least, that's all the evidence we have." Regarding factor (e)—whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act—the prosecutor argued: "Well, that one is there because again, these instructions are for all cases." He posited an example of a defendant's potential culpability for the death of an accomplice during commission of a crime, and suggested factor (e) had no application to the instant case.

When he reached factor (f)—whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct—the prosecutor argued that in his view factor (f) had no application under these facts since defendant had shot his victims, all unknown to him, in an obvious attempt to eliminate each as witness to his crimes. He concluded: "Simply doesn't apply to this case and again, is not in his favor. *It's an aggravating circumstance.*" (Italics added.) Similarly, in summarizing the evidence under factors (g) (extreme duress or substantial domination of another); (h) (mental disease or defect, or the effects of intoxication); and (j) (whether or not defendant was an accomplice and played a relatively minor role in the crimes), the prosecutor argued his viewpoint that those factors did not apply under the instant facts, but in each instance concluded by labeling them another "aggravating circumstance." Finally, the prosecutor at one point argued: "The mitigating factors are a possibility of two. *And the aggravating factors are all the rest.*" (Italics added.)

The prosecutor's argument constituted *"Davenport* error." (*People* v. *Davenport* (1985) 41 Cal.3d 247 [221 Cal.Rptr. 794, 710 P.2d 861].) In *Davenport* we held it improper for a prosecutor to argue that the mere absence of evidence of a statutory factor was itself an aggravating circumstance. (*Id.,* at pp. 289-290.) Although we stated in *Davenport* that such argument "should not in the future be permitted" (*ibid.*), we did not rely on the point in reversing the penalty judgment therein.

Defendant and amicus curiae urge that the *Davenport* error requires reversal of the penalty verdict. We do not agree. Initially, we note that defendant is barred from complaining of any prosecutorial misconduct in this regard because he failed to object to the prosecutor's arguments, and because a simple admonition would have readily clarified any confusion and cured any harm. (*People* v. *Green, supra,* 27 Cal.3d at p. 27; see *People* v. *Ghent, supra,* 43 Cal.3d at p. 777; *People* v. *Allen, supra,* 42 Cal.3d at p. 1284.) Moreover, this case was tried five years before our opinion in *Davenport,* and as noted, our language in that case strongly indicates that its rule is prospective only.

Turning to the question of prejudice, our review of the evidence, instructions, and arguments as a whole convinces us that the prosecutor's reference to the absence of mitigating evidence under factors (f), (g), (h), and (j) as "aggravating circumstances" could not, in reasonable possibility, have affected the jury's penalty verdict. (See *People* v. *Brown* (1988) 46 Cal.3d 432, 456 [250 Cal.Rptr. 604, 758 P.2d 1135].) In each instance the misnomer was directly preceded by argument in which the prosecutor urged the jury to find each of the four factors *inapplicable* to this case. Stated otherwise, he argued that defendant could not possibly claim "moral justification" for the shootings (factor (f)), did not act out of extreme duress or the domination of another (factor (g)), did not commit the crimes due to intoxication or mental illness (factor (h)), and had not played a "relatively minor role in the crimes" (factor (j)). Given the guilt phase evidence and verdicts, it is not reasonably possible that the *"Davenport"* error misled the jury in their task of weighing the applicable aggravating and mitigating circumstances. Furthermore, we view the prosecutor's statement—"[t]he mitigating factors are a possibility of two. And the aggravating factors are all the rest"—as an exhortation that the evidence supported the conclusion that the aggravating circumstances *overwhelmingly* outweighed the mitigating circumstances in this case.

Finally, we have observed that the impact of so-called *"Davenport* error" may be reduced where the jury fully understood the weighing function and the scope of its responsibilities and sentencing discretion at the penalty phase. (See, e.g., *People* v. *Brown, supra,* 46 Cal.3d at p. 456; *People* v. *Boyde* (1988) 46 Cal.3d 212, 263, fn. 4 [250 Cal.Rptr. 83, 758 P.2d 25] (conc. and

dis. opn. of Arguelles, J.).) As next shown, there was no prejudicial *Brown* error (*People* v. *Brown, supra,* 40 Cal.3d 412) in this case.

## 6. *Sentencing Discretion.*

 Defendant and amicus curiae contend that the mandatory sentencing formula of section 190.3 is unconstitutional on the ground that it withdraws constitutionally compelled sentencing discretion from the jury. "In *People* v. *Brown* [, *supra,* ] 40 Cal.3d 512, 538-544, vacated on other grounds *sub nom. California* v. *Brown* [, *supra,* ] 479 U.S. 538 [93 L.Ed.2d 934], however, we rejected that very contention. Defendant presents us with no compelling reason to reconsider our holding." (*People* v. *Hendricks* (1988) 44 Cal.3d 635, 650 [244 Cal.Rptr. 181, 749 P.2d 836].)

Although we found the statutory scheme of section 190.3 constitutional in *Brown,* "We acknowledge[d] that the language of the statute, and in particular the words 'shall impose a sentence of death,' leave room for some confusion as to the jury's role." (*People* v. *Brown, supra,* 40 Cal.3d at p. 544, fn. 17.) Our concern in *Brown* was that former CALJIC No. 8.84.2, which was drawn verbatim from the statutory language, might mislead the jury in fully comprehending its sentencing discretion and responsibility in two interrelated ways:

"First, we pointed out that the jury might be confused about the nature of the weighing process. As we observed: '[T]he word "weighing" is a metaphor for a process which by nature is incapable of precise description. The word connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of an imaginary "scale," or the arbitrary assignment of "weights" to any of them. Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all of the various factors he is permitted to consider.' [Citation.]

"Second, we were concerned in *Brown* that the unadorned instruction's phrase, 'the trier of fact . . . *shall* impose a sentence of death if [it] concludes that the aggravating circumstances outweigh the mitigating circumstances' (italics added), could mislead the jury as to the ultimate question it was called on to answer in determining which sentence to impose. Although the quoted phrase could be understood to require a juror (i) to determine whether 'the aggravating circumstances outweigh the mitigating circumstances' without regard to the juror's personal view as to the appropriate sentence, and then (ii) to impose a sentence of death if aggravation outweighs mitigation even if the juror does not personally believe death is the appropriate sentence under all the circumstances, we concluded in *Brown* that the statute was not intended to, and should not, be interpreted in that

fashion. Instead we stated: 'By directing that the jury "shall" impose the death penalty if it finds that aggravating factors "outweigh" the mitigating, the statute should not be understood to require any juror to vote for the death penalty *unless,* upon completion of the weighing process, *he decides that death is the appropriate penalty under all the circumstances.* Thus *the jury, by weighing the various factors,* simply *determines under the relevant evidence, which penalty is appropriate in the particular case.'*" (*People* v. *Allen, supra,* 42 Cal.3d at pp. 1276-1277, italics in original.)

■ Our review of counsel's arguments reveals nothing which would have confused the jury regarding the proper nature of the weighing process, our first concern in *Brown.* The prosecutor did not suggest that the weighing process was merely a "mechanical" or "counting" process. In explaining to the jurors their responsibility to weigh the evidence under the statutory factors, he argued: "[T]he reason that [the law] gives the jury the ultimate, or one of the ultimate steps in the job in this determination is because all cases are different. If they weren't, you could do something else. You wouldn't have to subject twelve people to this. You could add it up or figure it out, compute it or something. It would be easy. But it's not. There are different facts." The prosecutor then argued: "If the defense raises anything in this case . . . any real evidence . . . that there is a reason for sympathy towards this particular defendant, then of course that's something for you to *weigh.* . . ." (Italics added.) He explained that the procedure set forth in former CALJIC No. 8.84.2 was a weighing process: "The instruction says, look at the factors and see which *outweighs* the other." (Italics added.)

As previously noted, at one point in his argument the prosecutor stated, "[t]he mitigating factors are a possibility of two. And the aggravating factors are all the rest." Read in the context of the prosecutor's entire argument, we conclude this one statement could not in and of itself have misled the jury into thinking the weighing process was a mere mechanical counting of factors, with the death penalty to be imposed if the aggravating circumstances *numerically outnumbered* the mitigating ones. Again, the prosecutor was simply arguing his view of the case; i.e., that the only evidence worthy of any mitigating weight fit under factor (c) (the absence of prior felony convictions), and factor (i) (defendant's relatively youthful age).

Turning to our second concern in *Brown*; whether the jury understood the full scope of its sentencing discretion as to the ultimate question it was being called upon to answer—which sentence to impose—our examination of the instructions and arguments as a whole convinces us that the jury understood its obligation to determine whether or not death was the appropriate penalty in this case.

First, the court gave several supplemental instructions that helped clarify the jury's role. As previously noted, the jury was instructed that: "[I]n this

phase of the case, the penalty phase, pity and sympathy for the defendant would be proper considerations for you should you find them to be warranted in the circumstances." Immediately after instruction in the language of former CALJIC No. 8.84.2, the court instructed the jury that their penalty verdict must be the product of "the individual opinion of each juror," and that "[i]t is the duty of each of you to consider the evidence . . . . Each of you must decide the case for yourselves. . . ." (See *People* v. *Odle* (1988) 45 Cal.3d 386, 420 [247 Cal.Rptr. 137, 754 P.2d 184].)

Second, the prosecutor throughout his argument repeatedly stressed that the law in essence was *neutral* at the penalty phase, and that it was the jury's function to weigh the evidence under the relevant factors. He argued: "the law is not fixed on what the penalty should be . . . ," and explained: "You won't hear an instruction that says it's your duty to assume that one penalty or the other is proper. It's your duty to assume that this case, the law calls for a certain kind of verdict. You won't. In fact, it is neutral on the subject. It is entirely up to you what the facts are that you find to be the case." He reread former CALJIC No. 8.84.2 for the jurors and urged them to "look at the factors and see which outweighs the others." He reiterated that sympathy and passion for the defendant were proper considerations at the penalty phase, although he forcefully argued his view that there was little mitigating evidence to justify harboring such emotions for this defendant.

Several times during his argument, the prosecutor expressed disagreement with defense counsel's repeated characterization of the jury's task as being to determine whether to "kill" Marvin Walker. The prosecutor urged the jury to reject defense counsel's argument that a vote for the death penalty would be the "easy" or "popular thing to do," tantamount to a "cruel" act of "vengeance" for which the jurors would ultimately suffer a guilty conscience. At one point the prosecutor argued: "It's not necessary for either one of us to put this personal sort of blame on you."

Defendant urges that the prosecutor's argument may have lessened the jurors' sense of responsibility to individually arrive at an appropriate penalty determination. (See, e.g., *People* v. *Milner* (1988) 45 Cal.3d 227, 255-256 [246 Cal.Rptr. 713, 753 P.2d 669].) Although such argument in isolation might raise a legitimate concern that the jury was being misled, it could not have had such a misleading effect here. Throughout his argument the prosecutor sought to impart to the jury the gravity of their task and sentencing responsibilities: "I think the toughest thing that you will ever do, if you vote for the death penalty in this case, is to follow that instruction and do what the instruction says to do. To say that it's easy to vote for that [the death penalty] is a joke. Although there's nothing funny about it, it's extremely difficult. And we talked about that a great deal as this case started, and I

don't think there is a person up there who thinks it's something easy. . . . [¶] No one on this jury answered the questions, led anyone to believe, counsel or myself, that you think it would be easy to vote for the death penalty. It is tough. It might be the toughest thing you ever do. But it's called for here. *It's called for by the law*." (Italics added.)[11]

Third, in responding to the prosecutor's argument, defense counsel conceded to the jury that in one sense he was seeking to impose "a guilt trip" on them. He explained that what he had hoped to do "was to impress upon you a sense of responsibility, a personal responsibility in terms of your actions and what you must decide and how you must decide it. Whatever decision you make has to be your responsibility. Each one of us has to decide the issue individually, for your own as to what should be the appropriate circumstance. You can decide to kill Marvin, and that's what the death penalty is all about. It's killing people." Counsel told the jury: "You are the ones. Nobody else. [¶] If you decide that he's going to die, you're not going to be there at the time that it's done, obviously, but you put that machinery in operation." He implored the jury not to vote for the death penalty in this case, urging them to consider that "Marvin is a person, a human being." He urged them to look back upon their lives to the time they were 20 years of age when considering defendant's relative youth, to "[c]onsider his family as well," and "not to act from vengeance alone, but to show our understanding, our mercy. . . ." Counsel concluded his argument with the statement: "Your decision will be final. It will be the ultimate word on Marvin. I would only ask you for your mercy."

Although the prosecutor and defense counsel plainly disapproved of one another's choice of language, each was in his own words seeking to impress upon the jurors the solemnity of their *individual* sentencing obligations. In this fundamental sense the arguments were not in conflict. "This is not the

---

[11] Defendant and amicus curiae urge that the prosecutor's statement—"It's called for by the law"—itself may have improperly misled the jury into believing "the law" automatically called for the death penalty in this case. We do not agree. Read in the context of the above-quoted passage, the prosecutor was merely urging the jury to "do what the instruction says to do." He prefaced his comments with the statement, "*if* you vote for the death penalty in this case. . . ." (Italics added.) And as noted, the prosecutor had earlier in his argument told the jury: "the law is not fixed on what the penalty should be. . .," and explained: "You won't hear an instruction that says it's your duty to assume that one penalty or the other is proper. It's your duty to assume that this case, the law calls for a certain kind of verdict. You won't. In fact, it is neutral on the subject. It is entirely up to you what the facts are that you find to be the case."

Thus this is not a case like *People* v. *Myers* (1987) 43 Cal.3d 250 [233 Cal.Rptr. 264, 729 P.2d 698], wherein the prosecutor argued to the jury that their function was merely one of "fact-finding," and that once they found the aggravating outweighed the mitigating circumstances, "it shall be your duty to *affix* the verdict of the death penalty. You don't determine that. The law has determined that for you." (*Id.*, at p. 275, fn. 14, italics added; see *People* v. *Hendricks, supra,* 44 Cal.3d at pp. 653-655.)

type of case in which the jury was 'left . . . with the impression that its responsibility was merely to weigh aggravating and mitigating factors without regard to its view of the appropriateness of the alternative penalties, and that it was "required" to return a sentence of death if "aggravation outweighed mitigation" without, or even despite, each juror's *personal* conclusion from the evidence, about whether a sentence of death was appropriate under the circumstances for the offense and the offender.' (*Allen, supra,* 42 Cal.3d at p. 1278, italics in original.)" (*People* v. *Odle, supra,* 45 Cal.3d at p. 420.)

Viewing the arguments and instructions as a whole, we are satisfied they did not mislead the jurors as to the full nature of their sentencing discretion, and that the jurors realized the ultimate sentencing responsibility rested with them, and them alone. (*People* v. *Hendricks, supra,* 44 Cal.3d at p. 655.)

### 7. *Deletion of Nonapplicable Statutory Factors.*

 Defendant and amicus curiae contend that the trial court erred in failing to delete the nonapplicable or irrelevant statutory mitigating factors. (§ 190.3.) We have previously rejected this argument. (See *People* v. *Miranda, supra,* 44 Cal.3d at pp. 104-105; *People* v. *Ghent, supra,* 43 Cal.3d at pp. 776-777 [1977 death penalty law].) "[A]s is apparent from the statutory language, it is for the jury to determine which of the listed factors are applicable or 'relevant' to the particular case. (§ 190.3, par. 6.)" (*Miranda, supra,* 44 Cal.3d at p. 105.)

### 8. *Age as an Aggravating Factor.*

 One of the factors to be considered by the penalty jury "if relevant" is "[t]he age of the defendant at the time of the crime." (§ 190.3, factor (i).) Defendant and amicus curiae contend that the prosecutor committed misconduct in arguing that defendant's age of 20 years should be considered an aggravating factor.

The prosecutor argued defendant "certainly is old enough to know better," but he ultimately concluded defendant's relative youth could be considered a mitigating circumstance: "You take it or leave it. You can give it to him as a mitigating factor." He never affirmatively argued that defendant's chronological age weighed in favor of the death penalty. The argument was permissible. (*People* v. *Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052]; *People* v. *Ghent, supra,* 43 Cal.3d at p. 775.)

### 9. *Lack of Remorse as an Aggravating Factor.*

 Defendant and amicus curiae contend that the prosecutor impermissibly argued lack of remorse as an aggravating factor. The prosecutor

argued that the circumstances of the offenses, defendant's testimony, and his courtroom demeanor together evidenced his total lack of remorse for his crimes.

Defendant's failure to object or request a curative admonition has waived any claim of misconduct on appeal with regard to the argument. (*People v. Green, supra,* 27 Cal.3d at p. 27; *People v. Rodriguez, supra,* 42 Cal.3d at p. 788.) Although it is clear that the People may not present evidence in aggravation unless it is relevant to a statutory aggravating circumstance (*People v. Boyd, supra,* 38 Cal.3d at pp. 771-776), "we have held that, under a prior death penalty law, the presence or absence of remorse is a factor relevant to the jury's penalty decision. (*People v. Coleman* [(1969)] 71 Cal.2d [1159,] at p. 1168 [80 Cal.Rptr. 920, 459 P.2d 248].) The concept of remorse for past offenses as a mitigating factor sometimes warranting less severe punishment or condemnation is universal." (*People v. Ghent, supra,* 43 Cal.3d at p. 771.)

Here, the prosecutor's comments on defendant's lack of remorse "did no more than suggest the inapplicability of a mitigating factor." (*People v. Rodriguez, supra,* 42 Cal.3d at p. 790; *People v. Ghent, supra,* 43 Cal.3d at p. 771.) Even were we to read the prosecutor's argument as affirmatively advancing defendant's lack of remorse as an aggravating circumstance, our review of the record convinces us that such remarks could not have affected the penalty verdict. (*Ghent, supra,* 43 Cal.3d at pp. 775-776.)

### 10. *Prosecutorial Misconduct.*

Near the end of his closing argument, the prosecutor argued to the jury: "I think when he [defense counsel] says give him life imprisonment, that it diminishes, cheapens what's happened. It cheapens life, Joe Vasquez's life. But that's not written in the law either. That's just my personal opinion." Amicus curiae assigns the statement as misconduct, but defendant's failure to object or request an admonition below precludes raising the claim for the first time on appeal. (*People v. Green, supra,* 27 Cal.3d at p. 27.) In any event, the prosecutor stated he was merely expressing his "personal opinion," the jury was previously instructed that counsel's statements were neither evidence nor definitive pronouncements of the law, and this one isolated statement could not possibly have changed the verdict.

### 11. *Intercase Proportionality Review.*

Defendant urges that we conduct "intercase" proportionality review—i.e., an examination of whether imposition of the death penalty in his case is disproportionate to the penalties imposed on other persons who have committed similar offenses. It is settled, however, that the Eighth Amend-

ment requires no such comparison (*Pulley* v. *Harris* (1984) 465 U.S. 37, 50-54 [79 L.Ed.2d 29, 40-43, 104 S.Ct. 871]), and we have repeatedly so recognized in rejecting the claim. (See, e.g., *People* v. *Belmontes, supra,* 45 Cal.3d at p. 818.)

### III. DISPOSITION

The judgment is affirmed in its entirety.

Lucas, C. J., Panelli, J., Arguelles, J., and Kaufman, J., concurred. Mosk, J., concurred in the judgment only.

**BROUSSARD, J.**—I concur in the affirmance of the judgment as to guilt and in the sustaining of the special circumstance findings.

I dissent, however, from the affirmance of the judgment as to penalty. Our previous opinion rendered before this court granted rehearing reversed the penalty judgment because certain jury instructions may have caused the jury to misunderstand what evidence it could consider in mitigation, and to misunderstand the nature of its function in selecting the penalty. I adhere to the view that the instruction on the applicable factors in mitigation, along with the prosecutor's argument on these factors, require reversal. The trial court instructed the jury on the statutory factors in aggravation and mitigation, but did not explain that any aspect of the defendant's character and background which defendant proffers can be used as a basis for rejecting the death penalty. (See *People* v. *Easely* (1983) 34 Cal.3d 858, 878, fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].) Our original opinion found that the prosecutor had aggravated the misleading nature of the instruction by claiming that there were only two factors in mitigation—defendant's age, and his clean criminal record. The implication was, we thought, that the character and background evidence was not relevant in mitigation.

Since rehearing was granted in this case, we have determined, under the guidance of the United States Supreme Court, that the prejudicial effect of this sort of instructional error must be viewed in the context of the record as a whole, with particular emphasis upon the arguments which the prosecutor made to the jury. (*California* v. *Brown* (1987) 479 U.S. 538, 546 [93 L.Ed.2d 934, 943, 107 S.Ct. 837] (conc. opn. by O'Connor, J.); *People* v. *Ghent* (1987) 43 Cal.3d 739, 777-778 [239 Cal.Rptr. 82, 739 P.2d 1250]; see also *People* v. *Miranda,* (1987) 44 Cal.3d 57, 103 [241 Cal.Rptr. 594, 744 P.2d 1127].)

The majority claim that the prosecutor generally conceded the theoretical relevance of defendant's mitigating background evidence, but dismissed the evidence as insignificant. On the contrary, the prosecutor's discussion of defendant's background evidence was intended to persuade the jury that the

evidence did not fit into the statutory scheme. He told the jury that it should consider the so-called sympathy evidence only if it was applicable under the jury instruction on mitigating circumstances. He emphasized that the evidence of defendant's background, though sympathetic, had nothing to do with the case. He rebuked himself for failing to cross-examine the defense witnesses on whether they thought that defendant's background had anything to do with the charged crimes. He told the jury that the law would not tell them how the character and background evidence fit into the statutory circumstances in aggravation and mitigation, and that the instructions would not help them. His message was that the jury would have to figure out for itself, without guidance from the court, whether the evidence was relevant, but that, in the prosecutor's view, it was irrelevant because it did not mitigate culpability for the charged crimes. Under the circumstances, I adhere to my view that the jury was not adequately informed that it could consider defendant's mitigating background and character evidence as a basis for imposing a sentence less than death.

On rehearing, amicus curiae identified an additional error which reinforces my conclusion that the penalty judgment cannot stand. As the majority find, the evidence of defendant's threat against the police officer did not show the commission of a violation of any penal statute. (See *People* v. *Phillips* (1985) 41 Cal.3d 29, 72 [222 Cal.Rptr. 127, 711 P.2d 423]; see also *People* v. *Boyd* (1985) 38 Cal.3d 762, 776-778 [215 Cal.Rptr. 1, 700 P.2d 782].) Unlike the majority, it is my view that the evidence of defendant's courtroom threat against the prosecutor likewise did not show commission of a crime. The majority posit that the conduct could be a violation of Penal Code sections 69 or 71 (threatening an executive or public officer with intent to deter performance of his duties). "Although defendant voiced the threat in a low voice, he turned to face the deputy district attorney when he communicated it. The deputy had just completed conducting a preliminary hearing in which defendant was held to answer, had argued against his release on bail, and was able to hear at least a portion of the threat. Given the murder and assault charges which defendant faced, it could reasonably be perceived that he had the apparent ability to carry out the threat. The evidence thus supports an inference that defendant intended to thwart or deter further prosecution of his case by threatening the deputy district attorney, and each requisite element of a violation of section 69 was shown on these facts. [Citation.]" (Maj. opn., *supra,* at p. 639.)

My reading of the record discloses that defendant made the remark as he was escorted by the bailiff to the holding cell. The room was noisy, and defendant made the remark under his breath. The deputy district attorney who conducted the hearing was 20 feet away from defendant and did not hear any threat, but only heard the words "D.A." I see no evidence that defendant communicated any threat, or that he, a prisoner in custody and

under the immediate control of a bailiff, had any apparent ability to carry out any threat. (See *People* v. *Hopkins* (1983) 149 Cal.App.3d 36, 40-41 [196 Cal.Rptr. 609].) Nor do the charged crimes provide any evidence of his ability to carry out a threat to "get" a prosecutor while he was in custody—there was no evidence that he had access to hired killers; rather, he himself performed all the violence with which he was charged.

A review of the prosecutor's rebuttal argument to the jury makes it clear how important the threats were to his case for imposing the death penalty. The prosecutor urged the jury to consider the threats as a factor in aggravation under Penal Code section 190.3 factor (b) (uncharged crimes of violence). Without this improperly admitted evidence, the prosecutor would have had to admit that the absence of evidence of prior crimes of violence was a factor in mitigation. The prosecutor also made particular use of the evidence in his rebuttal argument, when he tried to counter defense counsel's plea for the punishment of life imprisonment. He argued that the threats showed that defendant would be violent and dangerous in prison, and that they showed such lack of remorse or consideration for the value of life that defendant was entitled to no mercy.

I remain convinced that there is a serious risk that the jury misunderstood one of the crucial tools it was to use in determining penalty, in that it did not understand the applicability of defendant's mitigating background evidence. The case in mitigation was truncated and the case in aggravation was enhanced not only by this misunderstanding, but also by the admission of very damaging evidence that defendant made threats of violence against representatives of the state. The jury was urged to consider these threats and their implication regarding future conduct in determining whether defendant should be incarcerated or executed. I would reverse the penalty judgment.

Appellant's petition for a rehearing was denied March 16, 1989.